TRANSYLVANIA R. CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 4325.

Circuit Court of Appeals, Fourth Circuit.

Oct. 4, 1938.

James M. McCready, of Pittsburgh, Pa. (R. T. M. McCready, of Pittsburgh, Pa., on the brief), for petitioner.

Howard P. Locke, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before NORTHCOTT and SOPER, Circuit Judges, and CHESNUT, District Judge.

NORTHCOTT, Circuit Judge.

This is a petition to review a decision of the United States Board of Tax Appeals involving income taxes of the Transylvania Railroad Company, a North Carolina Corporation, here referred to as the petitioner, for the year 1932, in the amount of $1,950.72. The opinion of the Board is reported in 36 B.T.A. 333.

The petitioner is the owner of a railroad approximately forty-two miles in length, running from Hendersonville, North Carolina, to Lake Toxaway, North Carolina.

On January 1, 1906, the petitioner leased its railroad, rights of way, buildings, franchises, equipment, and all other real and personal property to the Southern Railway for a period of 50 years, and has not since been active as an operating company. The lease provided for an annual rental of $25,000 for the first 10 years and $30,000 for each of the succeeding 40 years, the railroad to be operated entirely at the expense of the lessee. One of the conditions for the making of the lease was that the petitioner would issue first mortgage bonds to an extent of $434,000 (of an authorized issue of $500,000) bearing annual interest of 5 per cent and falling due January 1, 1956. The lease provided that the Southern Railway Company, the lessee, would pay the sum of $21,700 per annum to the trustee of the bonds to meet the interest as it accrued and became due and that the balance of $3,300 for each of the first 10 years and $8,300 for each of the succeeding 40 years would be paid directly to the petitioner, the lessor. The lessee was to pay all taxes and charges against the leased property.

In accordance with the condition of the lease the petitioner on January 1, 1906, issued first mortgage bonds of $434,000, using the proceeds to refund a prior bond issue of $350,000 and liquidate its floating debt. The balance of $66,000 in bonds was reserved in the hands of the trustee for betterments and improvements upon the property to be made thereafter. The petitioner's entire capital stock of a par value of $370,000 was issued free to purchasers of its bonds with the exception of a block of $25,000, for which petitioner received $16,000. The petitioner bound itself so to maintain its corporate organization during the term of the lease that its franchises might be available for the use of the lessee.

The Standard Trust Company and its successor, the Guaranty Trust Company, have acted as trustee under the mortgage, paying the interest to the bondholders, who are numerous and scattered. The trust instrument made no provision for a sinking fund.

In October, 1932, petitioner purchased $19,000 par value of its bonds for $4,750 and has since held these bonds in its treasury, so that it would be able to collect the interest on the bonds. Such interest has been collected by the petitioner since October, 1932, and has been reported as income in its income tax returns. The difference, $14,250, between the purchase price of the bonds and the par value of the bonds, was credited to its profit and loss account and charged to bonds held in the treasury, in accordance with the regulations of the Interstate Commerce Commission specifying that any bonds reacquired by the issuer "under circumstances which require that they shall not be treated as cancelled or retired" should be so treated.

The assets of the petitioner in 1932 consisted of cash in the bank of $10,000, $77,000 of its recovered bonds, and physical property as to which no value was computed by the petitioner in 1932, but the books of the company showed a valuation of this property of approximately $419,130 in June, 1905. No entries in the books showed either acquisition, improvements, obsolescence, or depreciation after June, 1905. The liabilities of the petitioner as of October, 1932, were approxi-

mately $500 in accounts payable and $434,000 of bonds issued, of which $77,000 had been recovered and were held in its treasury.

The lessee each year paid the rent specified in the lease and there has never been any evidence of dissatisfaction on the part of the lessee concerning the lease.

At the time of the lease with the Southern Railway the petitioner railroad, was in a flourishing condition and two daily passenger trains with Pullman service were operated in each direction over the forty-two miles of its line together with a daily freight service of ten or fifteen cars. The timber business was prosperous and a hotel was built at Lake Toxaway. Expected mineral developments did not materialize and the timber business gradually decreased until in 1932 only one lumber company was operating to sell off cut timber on hand, the hotel was closed and very little freight or passenger revenue was earned by the railroad. The use of newly constructed improved highways along the line of the railroad had virtually destroyed the railroad's business. A mixed passenger and freight train was operated daily chiefly because the lease to the Southern Railway required the operation of the railroad.

The Commissioner of Internal Revenue, the respondent, held that the difference between the $19,000 par value of the bonds purchased by the petitioner and the sum of $4,750, the price paid for the bonds, was a taxable gain and determined a deficiency against the petitioner in the amount of income taxes upon the sum of $14,250.

The only question for consideration is whether the taxpayer derived any taxable gain in the year 1932 by the purchase of the bonds in question.

The statute and regulations involved are the Revenue Act of 1932, c. 209, 47 Stat. 169 and Regulations 77, Article 68, which read as follows:

Revenue Act of 1932, c. 209, 47 Stat. 169, 178, Sec. 22, 26 U.S.C.A. § 22.

"*Gross Income.* 'Gross income' includes gains, profits, and income derived from * * *, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from * * *, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever."

Regulations 77, Revenue Act 1932, Article 68, (1) (c):

"*Sale and Retirement by Corporation of its Bonds.*—If, however, the corporation purchases and retires any such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is gain or income for the taxable year."

The respondent determined the deficiency and the Board based its decision upon the grounds, first, that the reacquired bonds need not actually be retired in order that gain would accrue from the purchase, and, second, that the repurchase of the bonds at a price less than the issuing price released assets for corporation uses. The two cases mainly relied upon on behalf of the Government are United States v. Kirby Lumber Company, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131, and Garland Coal & Mining Company v. Helvering, Commissioner of Internal Revenue, 64 App.D.C. 144, 75 F.2d 663. We are of the opinion that neither of these cases sustains the decision of the Board. It must be conceded, from the undisputed evidence in the case, that at the time of the purchase of the bonds in 1932 there had been practically a total loss in value of the physical property of the petitioner. The conditions were such that the railroad with all its properties was valueless and would have brought nothing at a sale. The only asset the petitioner had at that time was the lease to the Southern Railway Company which paid little more than enough to meet the interest on the bonds with no provision for a sinking fund for the payment of the principal when the bonds became due. Under these circumstances it was very doubtful whether the bonds had a value equal to the price petitioner paid for them. When these facts are considered it becomes at once apparent that there could not have been any such gain accruing to the petitioner in the transaction as was determined by the respondent. The argument that a gain was made equivalent to the difference between the par value of the bonds and the price paid is a highly technical one that should have no weight as against the equities of the situation.

Article 68 Regulation 77, above quoted, makes the retirement of the bonds a condition precedent to a taxing of a com-

72

puted gain in the transaction. Here there was no retirement of the bonds purchased and the undisputed evidence shows that there was no such intention, the intention being to hold them in order to collect the interest. They could have been resold, should it have been decided to do so, but until that was done it could not be definitely ascertained that any loss or gain resulted from the transaction.

 In the Kirby Lumber Case, supra, the bonds purchased were actually retired and the Supreme Court in that case specifically approved a regulation similar to regulations 77. In the Garland Coal & Mining Company Case, supra, Mr. Justice Groner, then Associate Justice and now Chief Justice of the United States Court of Appeals for the District of Columbia, said [page 664]:

"The test in such cases is the intention of the parties at the time of the transaction. 'Ordinarily the rule is that payment by one primarily liable on a note or bond extinguishes the obligation thereof, irrespective of his intention to the contrary; but in this case whether there was a payment or merely a transfer of the bonds is the exact question in issue. This, we think, depends upon the intention of the parties'." (Citing authorities.)

"And so, in this case the question is, the intention of petitioner when it redeemed its bonds."

There is no foundation in the evidence in the record for the statement in the majority opinion of the Board of Tax Appeals that "obviously petitioner has failed to show a failure of assets, or loss of the money originally borrowed." We do not understand how it could be said that, under the evidence and the conditions shown, there was any failure to show the loss of the money originally borrowed.

If the intention to retire the bonds purchased governs, certainly there was no intention here to retire them. As was well said by the dissenting member of the Board,

"If that intention of the purchaser of the bonds be controlling, it would be difficult to conceive a stronger case than this, proving that such intention was not to buy and retire the bonds, but was to keep them alive, as an investment. The Southern Railway Co., not the obligor, purchaser of the bonds, was obligated to pay the interest on them. That fact distinguishes the situation here from that in the Garland Case and is convincing to me that the petitioner purchased its bonds here with the intention, not of retiring them, but of keeping the obligation they reflected, alive."

 In the Kirby Lumber Case, supra, the upholding of the tax was based on two grounds: (1) The extinction of the purchased bonds; (2) the actual freeing of assets. As was said by the Supreme Court in Bowers v. Kerbaugh-Empire Company, 271 U.S. 170, 46 S.Ct. 449, 451, 70 L.Ed. 886, "but the mere diminution of loss is not gain, profit, or income." See, also, Commissioner of Internal Revenue v. Simmons Gin Company, 10 Cir., 43 F.2d 327.

The bonds were not retired and there was no intention of retiring them. The money invested in the railroad had virtually been lost and there was no freeing of assets when the bonds were purchased. No ascertainable gain accrued to the petitioner by the purchase of the bonds in the year 1932 and the decision of the Board of Tax Appeals is reversed.

Reversed.