*An appropriate decision will be entered.*

ESTATE OF JERROLD DELMAN, DECEASED, SIDNEY PEILTE, ADMINISTRATOR, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6220–77.　　Filed October 9, 1979.

*Donald G. Sutherland* and *Alan H. Lobley,* for the petitioners. *Elsie Hall,* for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in the Federal income taxes of petitioners for the taxable year 1973 as follows:

| Petitioners | Deficiency |
|---|---|
| Estate of Jerrold Delman, deceased, Sidney Peilte, administrator | $9,574.16 |
| Joseph Kroot and Rochelle Kroot | 27,984.00 |
| Meredith Nicholson and Elizabeth C. Nicholson | 7,655.00 |
| Gary Ruben and Irene Ruben | 35,495.00 |
| Alan I. Klineman and Dorothy C. Klineman | 39,724.00 |
| James Klineman and Elaine Klineman | 9,577.00 |

[1]The following petitioners are also included in this case: Joseph Kroot and Rochelle Kroot; Meredith Nicholson and Elizabeth C. Nicholson; Gary Ruben and Irene Ruben; Alan I. Klineman and Dorothy C. Klineman; James Klineman and Elaine Klineman; Sam Solotkin and Lillian Solotkin; Louis F. Cohen and Marcia Cohen; Robert A. Rose and Phyllis Rose; Edgar S. Joseph and Natalie Joseph; Abe J. Miller and Ida Miller; Stanley E. Leopold and Phyllis J. Leopold.

| | |
|---|---|
| Sam Solotkin and Lillian Solotkin ........................ | $5,684.68 |
| Louis F. Cohen and Marcia Cohen ........................ | 508.00 |
| Robert A. Rose and Phyllis Rose ......................... | 27,415.45 |
| Edgar S. Joseph and Natalie Joseph .................... | 59,919.00 |
| Abe J. Miller and Ida Miller ............................ | 55,209.00 |
| Stanley E. Leopold and Phyllis J. Leopold ........... | 8,730.00 |

The issues for our decision are: (1) Whether the petitioners, general partners in Equipment Leasing Co., realized gain in the amount of $677,916.27 when partnership equipment purchased by nonrecourse financing was repossessed by the vendor; (2) if gain was realized, whether pursuant to section 1245[2] the gain must be recognized as ordinary income; and (3) whether recognition of any gain realized may be deferred under sections 108 and 1017 by reducing the basis of other property held by the partnership.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Jerrold Delman, who was residing in Las Vegas, Nev., at the time of his death on November 21, 1976, filed his individual income tax return for the taxable year 1973 with the Internal Revenue Service Center, Memphis, Tenn. Sidney Peilte, administrator of the Estate of Jerrold Delman, maintained his legal residence in Las Vegas, Nev., at the time the petition in this case was filed.

All other petitioners, except Sam and Lillian Solotkin, filed joint income tax returns for the taxable year 1973 with the Internal Revenue Service Center, Memphis, Tenn. Sam and Lillian Solotkin filed a joint income tax return for the taxable year 1973 with the Internal Revenue Service Center, Chamblee, Ga. The residences of the individual petitioners at the time the petition was filed in this case were as follows: Joseph Kroot, Carmel, Ind.; Rochelle Kroot, Indianapolis, Ind.; Meredith and Elizabeth C. Nicholson, Golf, Ill.; Gary and Irene Ruben, Carmel, Ind.; Alan I. and Dorothy C. Klineman, Carmel, Ind.; James and Elaine Klineman, Indianapolis, Ind.; Sam and Lillian Solotkin,

---

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year 1973.

North Miami Beach, Fla.; Louis F. and Marcia Cohen, Indianapolis, Ind.; Robert A. and Phyllis Rose, Indianapolis, Ind.; Edgar S. and Natalie Joseph, Indianapolis, Ind.; Abe J. and Ida Miller, Indianapolis, Ind.; Stanley E. and Phyllis J. Leopold, Indianapolis, Ind.

Rochelle Kroot, Elizabeth C. Nicholson, Irene Ruben, Dorothy C. Klineman, Elaine Klineman, Lillian Solotkin, Marcia Cohen, Phyllis Rose, Natalie Joseph, Ida Miller, and Phyllis J. Leopold are parties to this action solely because they filed returns with their respective husbands. Accordingly, any reference to petitioners will not include the foregoing individuals.

In early spring 1968, Howard Zuckerman and Steven Miller approached petitioner Robert A. Rose, a partner in the Indianapolis law firm of Klineman, Rose & Wolf (hereinafter KRW), to discuss the organization and financing of a corporation to produce television shows.

Howard Zuckerman and Steven Miller had made an extensive preliminary study on the marketability of a mobile television van, which was a television production facility housed in a semitrailer truck. They had consulted with an accounting firm concerning the amount of funds needed to organize the new entity and to begin operations. They were advised that a minimum of $125,000 would be required. The funds invested were to be used to provide a 5-percent downpayment on a mobile television van facility prepared by Ampex Corp. (hereinafter Ampex). Negotiations for the purchase of the mobile van for $895,000 were then underway. In addition, the invested funds were to be used to provide for other capital improvements and initial working capital until the corporation's operations could become self-sustaining.

The original plan proposed by the accounting firm was to conduct the business as a corporation in which investors would invest partly in capital stock and partly in subordinated debentures. This plan was unacceptable to prospective investors for several reasons. First, the venture was a highly speculative one. Second, the purchase money obligation remaining on the equipment bought from Ampex would be considerable since only 5 percent of the $895,000 purchase price was to be paid as a downpayment. Third, by investing funds solely in a corporation, the investors would have no individual ownership rights in the equipment if the corporation were unsuccessful. Finally, the

investors were unwilling to invest all their funds in an enterprise in which the two operators, Howard Zuckerman and Steven Miller, would have no monetary investment. To overcome these objections, a compromise plan to form two entities to operate the enterprise was reached. The compromise plan provided first for the organization of a corporation in which the investors would receive an aggregate of 80 percent of the stock and in which Howard Zuckerman and Steven Miller would receive 20 percent of the stock. Second, a partnership would be formed in which the investors were to receive 75 percent and KRW was to receive 25 percent of the partnership interests.

On May 22, 1968, a general partnership was formed under Indiana law to do business under the name of Equipment Leasing Co. (hereinafter partnership A). The following amounts were contributed as capital or loaned to partnership A by the partners:

| Name | Capital | Loan |
|---|---|---|
| Abe J. Miller | $375 | $19,625 |
| Joseph Kroot | 125 | 6,875 |
| Edgar S. Joseph | 300 | 15,700 |
| Gary Ruben | 300 | 15,700 |
| Sam Solotkin | 75 | 3,925 |
| Robert A. Rose, as nominee | 75 | 3,925 |
| Meredith Nicholson | 50 | 2,350 |
| Jerrold Delman | 125 | 6,875 |
| Stanley E. Leopold | 100 | 4,900 |
| Robert A. Rose, as nominee | 500 | 0 |
| Total | 2,025 | 79,875 |

The partners of partnership A held the following interests in the profits and losses thereof:

| Name | Percent |
|---|---|
| Abe J. Miller | 18.43 |
| Joseph Kroot | 6.45 |
| Edgar S. Joseph | 14.75 |
| Gary Ruben | 14.75 |
| Sam Solotkin | 3.69 |
| Robert A. Rose, as nominee | 3.69 |
| Meredith Nicholson | 2.20 |
| Jerrold Delman | 6.45 |

Stanley E. Leopold .................. 4.61
Robert A. Rose, as nominee ......: <u>24.98</u>
100.00

Robert A. Rose held a 3.69-percent interest in the profits and losses of partnership A as a nominee for the benefit of himself and those individual partners of KRW who had invested their own funds in partnership A. Robert A. Rose also held a 24.98-percent interest in the profits and losses of partnership A as a nominee for KRW, which interest was received by that firm in lieu of a fee for services which it had performed in the organization of partnership A and the corporation. A bank account for partnership A was established from which checks were written in connection with its business.

On May 22, 1968, National Teleproductions Corp. (hereinafter NTP) was incorporated under Indiana law. Howard Zuckerman was issued 204 shares and Steven Miller was issued 203 shares of the class A common stock of NTP. Shares of the class B common stock of NTP were issued to the following persons, all of whom, except for Jerrold Delman whose estate is represented by Sidney Peilte, are petitioners herein:

| Name | Shares of class B stock issued |
|---|---|
| Abe J. Miller | 500 |
| Joseph Kroot | 175 |
| Edgar S. Joseph | 400 |
| Gary Ruben | 400 |
| Stanley E. Leopold | 125 |
| Sam Solotkin | 100 |
| Robert A. Rose | 100 |
| Jerrold Delman | 175 |
| Meredith Nicholson | 60 |
| Total | 2,035 |

The shareholders of the class B common capital stock of NTP paid $10 for each such share, for an aggregate of $20,350.

Each share of the class A and of the class B common stock of NTP had equal dividend rights and an equal vote on all matters subject to a shareholder vote. Holders of the class B common stock, however, elected one less director than the class A common stockholders. On the date it was incorporated, NTP

executed a conditional sales contract, number 370, with Ampex to purchase a mobile television van and related equipment (hereinafter first van) for $1,055,016.72 including finance charges of $204,766.72. The $44,750 required to be paid to Ampex as a downpayment on the first van was furnished to NTP by partnership A.

In an addendum to the Ampex conditional sales contract number 370 it was provided as follows:

> Ampex acknowledges receipt of notice and agrees that Purchaser may transfer, set over or assign its interest in the equipment herein and in this contract, to another business entity of Purchaser's choosing. It is understood and agreed that such assignee or transferee shall have no liabilities or responsibilities hereunder to Ampex, except that said equipment shall remain encumbered as herein provided until payment in full is received therefor, and such assignee or transferee accepts the equipment, subject only to the security interest granted to Ampex herein. Nothing herein shall relieve Purchaser or its guarantors of any obligations under this agreement.

NTP and partnership A negotiated with Ampex for this provision in the sales contract because of the intention of NTP to sell the first van to partnership A and then to lease it back.

On May 22, 1968, the first van was sold by NTP to partnership A pursuant to a written agreement and leased back pursuant to a written equipment lease. The lease payments to be paid to partnership A by NTP were greater than the payments required to be made to Ampex under conditional sales contract number 370.

Partnership A loaned $36,550 to NTP for use in its operations. The first van was delivered to NTP sometime in July or early August 1968. Thereafter, NTP began its business activities which involved the remote television production of sporting and other events, production of shows at its studio in Indianapolis, Ind., and production of television commercials. The business of NTP was successful and it had many customers.

Despite the fact that approximately $101,750 had been made available for NTP's use and its volume of business was good, NTP did not generate a sufficient cash flow to permit it to service its current business. Therefore, NTP borrowed $140,000 from American Fletcher National Bank & Trust Co. (hereinafter AFNB), Indianapolis, Ind. Partnership A subordinated its $36,550 loan to NTP to the loan made by AFNB. NTP still needed additional funds, however, for working capital and for asset acquisition. NTP had begun negotiations with Ampex for

the purchase of an additional television mobile van and related equipment for use in its operations. Consequently, NTP decided to undertake a public stock offering and began negotiations with an underwriter, Amos Treat Associates, Inc., for this purpose. In connection with the proposed public stock issue, a preliminary prospectus was filed with the Securities and Exchange Commission.

During the preparations for the proposed public issue of NTP's stock, the underwriters required that the first van, which was then owned by partnership A and leased to NTP, be transferred to NTP and that the loan of partnership A to NTP in the amount of $36,550 be contributed as additional capital to NTP. These requirements were imposed by the underwriters in order to make the common stock of NTP more marketable.

The partners of partnership A were reluctant to agree to these requirements of the underwriters since, if the public issue of NTP's stock proved unsuccessful, the partners of partnership A would lose all the control over the first van for which they had bargained at the time of their initial investment in the partnership and NTP. Moreover, the partners, by contributing the $36,550 loan as capital to NTP, would be in a subordinate position to NTP's other creditors including Ampex. Nevertheless, the underwriters held fast to their requirement that the first van be transferred to NTP and that the partnership A loan to NTP be contributed as capital.

The partners of partnership A reluctantly agreed to the requirements of the underwriters, made the contributions to the capital of NTP, and, on January 31, 1969, transferred the first van to NTP. As a condition of the transfer, however, the partners of partnership A agreed with NTP that if the public issue of NTP's stock was unsuccessful, NTP would transfer to partnership A all of NTP's interest in the additional equipment that NTP was then negotiating to purchase from Ampex.

On April 22, 1969, NTP executed conditional sales contracts numbers 61111, 61112, and 61113 for the purchase from Ampex of additional equipment. In an addendum to each sales contract, it was provided in part as follows:

Ampex acknowledges receipt of notice and agrees that Purchaser may transfer, set over or assign its interest in the equipment herein and in this contract, to another business entity of Purchaser's choosing. It is understood and agreed that such assignee or transferee shall have no liabilities or

responsibilities hereunder to Ampex, except that said equipment shall remain encumbered as herein provided until payment in full is received therefor, and such assignee or transferee accepts the equipment, subject only to the security interest granted to Ampex herein. Nothing herein shall relieve Purchaser or its guarantors of any obligations under this agreement.

By mid-summer of 1969, it was apparent that the condition of the securities market in the United States precluded a successful public issue of NTP's common capital stock. Accordingly, no public issue of NTP's stock was attempted. Instead, the individuals who had been members of partnership A formed a second general partnership under Indiana law also named Equipment Leasing Co. (hereinafter Equipment Leasing). The articles of partnership dated December 26, 1969, documented this action and provided in part as follows:

WHEREAS, each of the parties hereto was a partner in Equipment Leasing Company, a partnership formed for the purpose of leasing certain tangible personal property to National Teleproductions Corp.; and

WHEREAS, the partners of Equipment Leasing Company terminated said partnership and contributed all its assets to National Teleproductions as a contribution to the capital of the company, reserving, however, the right to acquire and lease to National Teleproductions Corp. certain additional equipment in which that company was purchasing in the event a proposed public sale of the common stock of National Teleproductions did not become effective, which would mean that NTP would need additional finances to purchase such equipment; and

WHEREAS, by August 1, 1969, it was clear that the public sale of the stock of National Teleproductions Corp. would not be accomplished and that certain equipment of National Teleproductions belonged to the parties hereto subject to a leaseback to it; and

WHEREAS, the parties now want to formalize their actions and make a written record of the facts:

Now, THEREFORE, in consideration of the premises and in order to enable the parties to carry forth the transactions which they previously contemplated, the parties hereby enter into the following ARTICLES OF PARTNERSHIP which shall be a successor to the prior Equipment Leasing Company, a partnership.

The partners of Equipment Leasing, their capital accounts, and their interests in the profits and losses of the partnership were as follows on December 26, 1969:

| Name | Capital account | Percentage interest in profits and losses |
|---|---|---|
| Abe J. Miller | $375 | 18.43% |
| Joseph Kroot | 125 | 6.45% |
| Edgar S. Joseph | 300 | 14.75% |

| | | |
|---|---|---|
| Gary Ruben .......................... | $300 | 14.75% |
| Sam Solotkin ......................... | 75 | 3.69% |
| Robert A. Rose ...................... | 575 | 12.883% |
| Alan I. Klineman | | |
| (Robert A. Rose, as nominee) ...................... | | 11.14% |
| James Klineman | | |
| (Robert A. Rose, as nominee) ...................... | | 4.357% |
| Louis F. Cohen | | |
| (Robert A. Rose, as nominee) ...................... | | .29% |
| Jerrold Delman ...................... | 125 | 6.45% |
| Meredith Nicholson .................. | 50 | 2.20% |
| Stanley E. Leopold .................. | 100 | 4.61% |
| Total .............................. | 2,025 | 100.00% |

On December 26, 1969, a formal bill of sale was executed in which NTP documented the prior transfer during the previous summer to Equipment Leasing of NTP's right, title, and interest in the Ampex equipment referred to in conditional sales contracts numbers 61111, 61112, and 61113. The bill of sale states that "the property is hereby transferred subject to all claims, expenses, liens and encumbrances to which the equipment may be subject." This was reflected on the workpapers the accountant prepared for Equipment Leasing as a debit to equipment in the amount of $1,284,612 and as credits to liabilities in the amount of $1,220,100 (the amount of such indebtedness) and to rental income from NTP of $64,512. The liability in the amount of $1,220,100 was included in the partners' bases in their partnership interests.

NTP leased back the Ampex equipment referred to in Ampex conditional sales contracts numbers 61111, 61112, and 61113 from Equipment Leasing pursuant to a written agreement dated December 26, 1969, under which the aggregate lease payments to be paid to Equipment Leasing by NTP were greater than the payments required to be made to Ampex under the conditional sales contracts. This equipment was delivered to NTP by Ampex and was at all times in the possession of NTP until its repossession by Ampex on December 14, 1973.

On May 29, 1970, NTP and Equipment Leasing executed a Clarification and Amendment of Lease which reduced the term of the lease from 10 years to 5 years and gave the lessee an option to extend the term of the lease for a period of 3 years. The Clarification and Amendment of Lease also provided that

the downpayment of $64,512 on the Ampex equipment, paid by NTP to Ampex, was to be treated as additional rent during the first 7 months of the lease agreement, since Equipment Leasing had purchased the Ampex equipment from NTP for the full purchase price from Ampex of $1,284,612. The schedule of monthly rentals of the original lease agreement was deleted and a new schedule of monthly rentals was substituted.

Throughout the term of the lease of the Ampex equipment covered by conditional sales contracts numbers 61111, 61112, and 61113 between NTP and Equipment Leasing, NTP satisfied its rental obligation to Equipment Leasing by making the payments due to Ampex under the aforementioned conditional sales contracts and no money was ever directly paid to Equipment Leasing. Following the sale of the Ampex equipment by NTP to Equipment Leasing and the leaseback of the equipment, NTP initially was able to make timely payments to Ampex as called for under the Ampex conditional sales contracts. Because of financial reverses, however, NTP began to fall behind on its rental payments. Consequently, NTP negotiated modifications in the payment obligations to Ampex under the conditional sales contracts. On November 24, 1970, NTP and Ampex executed an amendment to the conditional sales contracts whereby NTP's installment obligations to Ampex were reduced effective as of June 1, 1970, and were made payable over a longer period of time. On the same date, NTP and Equipment Leasing executed a second lease which provided that the lease payments for the Ampex equipment were to be reduced as of June 1, 1970, to reflect the reduced installment payments permitted by Ampex.

In April 1971, NTP and Ampex negotiated an agreement under which NTP's payments on the Ampex equipment were waived for the months of April, June, and July of 1971. In return NTP executed five promissory notes, each in the amount of $18,000, payable respectively on August 15, 1971, September 15, 1971, October 15, 1971, November 15, 1971, and December 15, 1971.

On July 12, 1971, NTP and Equipment Leasing executed a third amendment to the equipment lease agreement with respect to the Ampex equipment. This third amendment provided for a waiver of rental payments to be made by NTP to Equipment Leasing for the months of April, June, and July of

1971, and for increased rental payments for August, September, October, November, and December 1971.

In December 1971, petitioners sold their NTP stock on an installment basis to Telecontrol Associates, Inc. (hereinafter Telecontrol), of Chicago, Ill. However, Telecontrol paid only approximately $14,000 of its purchase obligations. The shareholders suffered a loss on the sale.

Despite the reduced payment schedules and the deferral of installment payments provided for in the various amendments to the Ampex conditional sales contracts, NTP was unable to make the payments called for under the conditional sales contracts to Ampex. By letter dated November 16, 1973, Ampex notified NTP and Equipment Leasing in writing that a default existed in the payments due under certain contracts including numbers 61111, 61112, and 61113. That letter stated in part:

> Unless all defaults under all of the above agreements are cured within twenty (20) days from the date of this letter, Ampex Corporation shall exercise all rights available to it under all above described agreements and instruments, and all applicable laws, including, but not limited to, the repossession of all equipment covered by such instruments and/or the public or private sale or sales of such equipment on or after December 12, 1973.

On December 12, 1973, Ampex notified NTP and Equipment Leasing by telegram that Ampex was exercising its repossession rights under certain contracts, including numbers 61111, 61112, and 61113. In compliance with the Ampex direction for repossession, on December 14, 1973, the Ampex equipment was surrendered to Ampex. On December 14, 1973, the balance due Ampex under the conditional sales contracts numbers 61111, 61112, and 61113 was $1,182,542.07.

Prior to the repossession of the Ampex equipment, Equipment Leasing had reported depreciation deductions on the Ampex equipment in the aggregate amount of $779,986.20 on the partnership income tax returns for the taxable years 1969 through 1973. The adjusted basis of the Ampex equipment on December 14, 1973, was $504,625.80, and the fair market value of the Ampex equipment on December 14, 1973, was $400,000.

Immediately prior to the repossession of the Ampex equipment, the assets of Equipment Leasing were the Ampex equipment, which had a fair market value of $400,000 (subject, however, to a liability of $1,182,542.07), and a checking account at AFNB which contained a balance of $93.10. The liabilities of

Equipment Leasing immediately prior to the repossession of the Ampex equipment were $3,940, consisting of legal and accounting fees and expenses. Immediately following the repossession of the Ampex equipment the only asset of Equipment Leasing was the $93.10 balance in its checking account at AFNB and the liabilities of Equipment Leasing were the $3,940 legal and accounting fees and expenses.

On December 27, 1973, Equipment Leasing borrowed $700,000 from AFNB. The proceeds from this loan were used by Equipment Leasing to purchase certain bonds, notes, and trust certificates having a par value of $700,000 and having a total purchase price of $702,728.

On its U.S. Partnership Return of Income (Form 1065) for the taxable year 1973, Equipment Leasing reported a taxable loss for the year of $110,128.85. This taxable loss was composed of the following items of income and deductions:

*Income*

| | |
|---|---|
| Rent on Ampex equipment | $29,079.05 |
| Total | 29,079.05 |

*Deductions*

| | |
|---|---|
| Depreciation on Ampex equipment | $49,277.43 |
| Interest on Ampex equipment | 29,079.05 |
| Bad debt | 60,851.42 |
| Total | 139,207.90 |

Each of the petitioners reported a ratable share of this loss on his 1973 Federal income tax return based upon his share of the profits and losses of Equipment Leasing as provided for in the partnership agreement.

With its U.S. partnership return for the taxable year 1973, Equipment Leasing filed Form 982, "Consent to Adjustment of Basis of Property Under Sections 1017 and 1082(a)(2) of the Internal Revenue Code" and elected to reduce the basis of the bonds, notes, and trust certificates, which the partnership had purchased, by $677,916.27, which amount represents the difference between $1,182,542.07, the amount of the debt to Ampex with respect to the Ampex equipment, and $504,625.80, the adjusted basis of the Ampex equipment.

The respective bases of the partners' partnership interests in

Equipment Leasing on December 14, 1973, immediately prior to repossession of the Ampex equipment were as follows:

| Partner | Partner's basis on 12/14/73 prior to repossession |
|---|---|
| Robert A. Rose | $62,874.05 |
| Stanley E. Leopold | 21,668.25 |
| Jerrold Delman | 33,898.37 |
| Sam Solotkin | 16,540.69 |
| Gary Ruben | 78,107.33 |
| Edward S. Joseph | 78,107.33 |
| Joseph Kroot | 31,898.36 |
| Abe J. Miller | 98,592.53 |
| Alan I. Klineman | 54,566.51 |
| James Klineman | 20,765.56 |
| Louis F. Cohen | 1,380.13 |
| Meredith Nicholson | 8,251.69 |
| Total | 506,650.80 |

The total of $506,650.80 included the $2,025 contribution to capital accounts receivable plus the liability on the Ampex equipment in the total amount of $504,625.80.

## OPINION

The issues here concern the tax consequences of the repossession of certain electronic equipment which was purchased by nonrecourse financing. The equipment initially was purchased by NTP from Ampex for $1,284.612. NTP made a downpayment of $64,512 and agreed to pay the remainder in installments. The equipment, subject to the nonrecourse indebtedness which secured the balance of the purchase price payable to Ampex, was then the object of a sale and leaseback between NTP and Equipment Leasing, in which petitioners were general partners. NTP executed the sale by assigning its rights under the contracts with Ampex to Equipment Leasing. Thereafter, Equipment Leasing reported allowable depreciation in the aggregate amount of $779,986.20 on partnership returns filed for the taxable years 1969 through 1974. On December 14, 1973, Ampex repossessed the equipment. At that time, the balance due to Ampex under the sales contracts was $1,182,542.07, Equip-

ment Leasing's adjusted basis in the equipment was $504,625.80, and the fair market value of the equipment was $400,000.

The first issue is whether Equipment Leasing realized gain as a result of the repossession. A repossession of property securing a debt constitutes a taxable sale or exchange. See *Helvering v. Hammel*, 311 U.S. 504, 506–511 (1941); *R. O'Dell & Sons Co. v. Commissioner*, 169 F.2d 247, 248 (3d Cir. 1948); *Unique Art Manufacturing Co. v. Commissioner*, 8 T.C. 1341, 1342–1343 (1947). Section 1001(a) provides that the gain from the sale or other disposition of property shall be the excess of the amount realized over the adjusted basis of the property. Section 1001(b) defines amount realized in a sale or other disposition as the sum of any money received plus the fair market value of other property received. In *Crane v. Commissioner*, 331 U.S. 1 (1947), the Supreme Court held that when property subject to a nonrecourse debt is sold, the amount realized by the taxpayer includes the balance of the nonrecourse debt. Although the Supreme Court left the issue open in *Crane v. Commissioner*, 331 U.S. 1, 14 n. 37, subsequent lower court decisions have consistently held that the amount realized upon the disposition of property includes the balance due on the nonrecourse liability even if it exceeds the fair market value of the property. See *Tufts v. Commissioner*, 70 T.C. 756, 763–766 (1978); *Millar v. Commissioner*, 67 T.C. 656, 660 (1977), affd. on this issue 577 F.2d 212, 214–216 (3d Cir. 1978); *Woodsam Associates, Inc. v. Commissioner*, 16 T.C. 649, 654–655 (1951), affd. 198 F.2d 357 (2d Cir. 1952); *Mendham Corp. v. Commissioner*, 9 T.C. 320, 323–325 (1947). See also *Lutz & Schramm Co. v. Commissioner*, 1 T.C. 682, 688–689 (1943).

Applying these rules to the facts of this case, respondent contends that as a result of the repossession, Equipment Leasing realized a gain of $677,916.27, the amount by which the balance of the nonrecourse loan exceeded the partnership's adjusted basis in the equipment. Petitioners, on the other hand, contend that, contrary to the precedent of *Millar v. Commissioner, supra,* and *Tufts v. Commissioner, supra,* no gain was realized since the fair market value of the equipment was less than the nonrecourse indebtedness outstanding and less than the adjusted basis of the equipment. Alternatively, petitioners contend that no gain was realized since immediately before and immediately after the repossession the partnership was insolvent. As a

final alternative under the first issue, petitioners contend that gain realized by the partners was limited by section 752(c) to the amount by which the fair market value of the equipment exceeded the partners' adjusted bases in their partnership interests. After careful consideration of the arguments of the parties, we agree with respondent that none of petitioners' contentions provides an adequate ground for resolution of the first issue in their favor.

With regard to petitioners' first argument, we think that *Tufts* and *Millar* were decided correctly and control the outcome here. In each of those cases, the taxpayer's property was the object of a taxable disposition at a time when the fair market value of the property was less than the amount of nonrecourse liabilities secured by the property. As here, the taxpayers relied on dictum in note 37 of the Supreme Court opinion in *Crane v. Commissioner*, 331 U.S., 14, which states that:

> Obviously, if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage. Consequently, a different problem might be encountered where a mortgagor abandoned the property or transferred it subject to the mortgage without receiving boot. That is not this case.

In both *Tufts* and *Millar*, we rejected the argument that this dictum required a holding that the nonrecourse loan should be omitted in computing gain realized by the taxpayer. In reaching that conclusion, we noted that the taxpayers had received a benefit from the nonrecourse loans since they had been included in basis and, consequently, permitted depreciation deductions. As we noted in *Tufts v. Commissioner*, 70 T.C. 756, 765–766:

> The Court of Appeals for the Third Circuit, in affirming our decision [in *Millar*], found it to be "totally in keeping with the spirit and reasoning of *Crane*." 577 F.2d at 215. The Court held that the principal reason for the *Crane* holding was to prevent the double tax deductions which would otherwise result. 577 F.2d at 215. The court further found that note 37 of the *Crane* opinion was not intended to create an exception to the rule in cases in which the fair market value of the property surrendered or exchanged is less than the amount of the nonrecourse liability to which the property is subject. 577 F.2d at 215. The footnote merely pointed out that the Supreme Court did not have before it a situation in which the value of the property was less than the liability and that the economic consequences might be different in such a situation. If note 37 were read to provide an exception when the value of the property is less than the liability, the result would be totally inconsistent with the rationale for the holding of the Court, that is, since the total liability has been taken into consideration in determining other tax consequences of the

transaction, the total liability must also be included in the amount realized when the property is transferred. 577 F.2d at 215. [Fn. ref. omitted.]

This logic applies with equal force to petitioners' case. The amount of the nonrecourse liability was included in the partnership's basis in the property and in the individual partners' bases in their partnership interests. As a consequence, the partnership took depreciation deductions with respect to the property which in turn led to losses for income tax purposes, thereby providing each partner a tax benefit[3] to the extent of his distributive share.[4] Under these circumstances, the principles of *Crane*, *Millar*, and *Tufts* apply, and the entire balance of the nonrecourse liability is included in the amount realized by Equipment Leasing, notwithstanding the fact that the liability exceeded the fair market value of the property repossessed.[5]

---

[3]In arguing on brief that *Millar* and *Tufts* should be overruled, petitioners have taken the tax benefit discussion in the opinions in *Millar* and *Tufts* out of context and have attempted to use it as a bridge to justify discussion of cases dealing with the tax benefit rule. Such cases are theoretically and factually distinct and in no way negate the persuasive line of authority controlling the outcome here. See and compare *Nash v. United States*, 398 U.S. 1 (1970); *Citizens' Acceptance Corp. v. United States*, 462 F.2d 751 (3d Cir. 1972); *Mayfair Minerals, Inc. v. Commissioner*, 456 F.2d 622 (5th Cir. 1972); *Bear Manufacturing Co. v. United States*, 430 F.2d 152 (7th Cir. 1970); *Spitalny v. United States*, 430 F.2d 195 (9th Cir. 1970); *North American Coal Corp. v. Commissioner*, 97 F.2d 325 (6th Cir. 1938); *Anders v. United States*, 199 Ct. Cl. 1, 462 F.2d 1147, cert. denied 409 U.S. 1064 (1972); *Alice Phelan Sullivan Corp. v. United States*, 180 Ct. Cl. 659, 381 F.2d 399 (1967); *Tennessee Carolina Transportation, Inc. v. Commissioner*, 65 T.C. 440 (1975), affd. 582 F.2d 378 (6th Cir. 1978).

Under the tax benefit rule, an item properly deducted in determining 1 year's tax liability is includable in income if it is recovered in a subsequent year. See *Tennessee Carolina Transportation, Inc. v. Commissioner, supra* at 446. Petitioners argue that generally cases applying the tax benefit rule require an actual receipt of funds or a discharge of a liability increasing the taxpayer's net worth before income results; since neither is present here, petitioners contend they realized no income. We disagree. Regardless of the merits of petitioners' argument in other contexts, no such requirements for taxation exist when a sale or exchange of property subject to a nonrecourse liability takes place. In *Crane*, neither a receipt of funds corresponding to previous depreciation deductions taken nor a discharge of a liability resulting in an increase in the taxpayer's net worth occurred. The Supreme Court nevertheless held that the amount of the nonrecourse liability was includable in the amount realized by the taxpayer upon the sale of the property.

[4]On brief, petitioners argue that there is no evidence in this case which would establish what tax benefits the petitioners may have enjoyed and, consequently, it would be unwarranted for this Court to sustain respondent's position. We disagree. The 1973 income tax returns of Equipment Leasing and the petitioners are in evidence and indicate depreciation deductions of $49,277.43 claimed and an aggregate loss of $110,128.85 of which each partner reported his distributive share. In addition, the parties stipulated that Equipment Leasing claimed aggregate depreciation deductions on the Ampex equipment of $779,986.20 over the period 1969 through 1973. It is fair to infer that the partners received a corresponding tax benefit. Moreover, to the extent petitioners would have us draw a contrary inference, they have failed to meet their burden of proof. See *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

[5]Petitioners contend that in *Millar* and *Tufts* this Court's reliance on *Woodsam Associates, Inc.*, *Mendham Corp.*, and *Lutz & Schramm Co.* was unjustified since, unlike here or in *Millar* or *Tufts*, those cases involve new money obtained by way of nonrecourse financings subsequent to the initial purchase. The rationale for including such "new money" nonrecourse financing in the amount realized upon the subsequent foreclosure is that otherwise the taxpayer would escape taxation on amounts he

Petitioners' second argument under the first issue is that Equipment Leasing did not realize income upon the repossession since immediately before and immediately after the repossession the partnership was insolvent. Respondent, on the other hand, contends that insolvency is pertinent only as an exception to discharge of indebtedness income arising under the holding of *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931), as codified in section 61(a)(12), and not to the type of income here which arises under the holding of *Crane* as section 61(a)(3) "gains derived from dealings in property." We agree with respondent.

Although the distinction between income arising from the transfer of property and income arising from the discharge of indebtedness has not always been clearly defined,[6] it is evident

---

unquestionably had received and used for his own benefit. See *Woodsam Associates, Inc. v. Commissioner*, 16 T.C. 649, 653–655 (1951); *Mendham Corp. v. Commissioner*, 9 T.C. 320, 323–325 (1947); *Lutz & Schramm Co. v. Commissioner*, 1 T.C. 682, 688–689 (1943). Petitioners argue that such a rationale is inapplicable to their case since no funds were received by them corresponding to the amount of the nonrecourse liability and, consequently, the amount realized upon repossession should not include the balance of the liability.

It is not clear to us that the economic benefit achieved by a subsequent nonrecourse financing is necessarily distinguishable from that achieved by a purchase mortgage nonrecourse financing. Under either method of financing, the taxpayer enjoys the use of the property while limiting the amount of his own funds at risk in the property, thereby freeing funds for the taxpayer's own benefit elsewhere. We find it unnecessary to deal with this argument in any detail, however, since *Millar* and *Tufts* establish that the tax benefit alone would support a holding against petitioners.

Petitioners also attack *Millar* as improperly relying on the First Circuit opinion in *Parker v. Delaney*, 186 F.2d 455 (1st Cir. 1950), cert. denied 341 U.S. 926 (1951). *Parker* is factually distinguishable from the facts of *Millar*, *Tufts*, and the instant case since it involved a foreclosure transfer of property with a fair market value at least equal to the mortgage balance. It is erroneous to conclude, however, as petitioners do, that the clear implication of language in the *Parker* decision is that the mortgage balance would not have been included in the amount realized if the fair market value were less than the indebtedness. To the contrary, the First Circuit merely followed the approach of the Supreme Court in *Crane* in pointing out the factual situation it was not addressing. See 186 F.2d at 458.

[6]See generally W. Donald, M. Chirelstein & A. Suwalsky, "Cancellation of Indebtedness," 88–3d Tax Management; L. Del Cotto, "Basis and Amount Realized under *Crane:* A Current View of Some Tax Effects in Mortgage Financing," 118 U. Pa. L. Rev. 69 (1969); J. Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225 (1959).

For example, some confusion has existed concerning the appropriate tax treatment if cancellation of indebtedness for which a taxpayer is personally liable is accompanied by a transfer of property. An early case ignored the taxable exchange aspect of a transfer of property with a fair market value greater than its basis and permitted a taxpayer to escape taxation under the insolvency exception by characterizing the entire gain as cancellation of indebtedness income. See *Dallas Transfer & Terminal Warehouse Co. v. Commissioner*, 70 F.2d 95 (5th Cir. 1934). *Dallas Transfer* was followed by this Court in *Main Properties, Inc. v. Commissioner*, 4 T.C. 364, 383–385 (1944). See also *Brutsche v. Commissioner*, 65 T.C. 1034, 1063 (1976) (*Brutsche* quotes *Texas Gas Distributing Co. v. Commissioner*, 3 T.C. 57, 61–62 (1944), for the principle that "Where an insolvent debtor turns over all or part of his property to his creditors in full or partial satisfaction of his debts, if the debtor remains insolvent he realizes no taxable gain." The facts of *Brutsche* and *Texas Gas*, however, do not indicate that the property transferred had a fair market value in excess of basis).

The view in the regulations, however, is that only the difference between the fair market value of

that the theory underlying *Kirby Lumber,* and its exception, has no application to petitioners' case. *Kirby Lumber* established the principle that a cancellation of indebtedness results in a realization of income by the debtor since it effects a freeing of assets previously offset by the liability. In other words, the cancellation results in an increase in the taxpayer's net worth which the Supreme Court has characterized as an "accession to income." *United States v. Kirby Lumber Co., supra* at 3.

A major exception to this general rule of income recognition upon debt cancellation is the insolvency exception which petitioners seek to invoke. The theory of this exception is that no accession to income has occurred if after the debt cancellation, the taxpayer remains insolvent since no assets have been freed. See, e.g., *Transylvania R. Co. v. Commissioner,* 99 F.2d 69 (4th Cir. 1938); *Conestoga Transportation Co. v. Commissioner,* 17 T.C. 506, 513 (1951); *Quinn v. Commissioner,* 31 B.T.A. 142, 145 (1934). To the extent the cancellation renders the taxpayer solvent, however, he is deemed to have realized income in the amount by which his assets exceed his liabilities immediately after the cancellation. See, e.g., *Haden Co. v. Commissioner,* 118 F.2d 285, 286 (5th Cir.), cert. denied 314 U.S. 622 (1941); *Lakeland Grocery Co. v. Commissioner,* 36 B.T.A. 289, 291–292 (1937). The insolvency exception applies only for cancellation of indebtedness income. For all other types of income, such as wages, rents, income, and gains from dealings in property, the solvency of the taxpayer is irrelevant. See *Home Builders Lumber Co. v. Commissioner,* 165 F.2d 1009, 1011 (5th Cir. 1948); *Parkford v. Commissioner,* 133 F.2d 249, 251 (9th Cir.), cert. denied 319 U.S. 741 (1943).[7]

Analysis of the facts of *Crane* and this case indicates that the principles of *Kirby Lumber* and its progeny have no application

---

the property transferred and the balance due on the obligation is cancellation of indebtedness income. See sec. 1.1017–1(b)(5), Income Tax Regs. Presumably under this approach either gain or loss could be realized. See *United States v. Hall,* 307 F.2d 238, 242 (10th Cir. 1962). See also *Bialock v. Commissioner,* 35 T.C. 649, 660 (1961).

The more difficult area concerns indebtedness incurred to purchase specific property. Such indebtedness is reflected in the basis of the property, and to the extent a taxpayer receives tax benefits from it, the logic of *Millar* and *Tufts* would appear to apply even if the taxpayer is personally liable. Since the taxpayer is personally liable on the note, however, the cancellation of indebtedness rationale may also apply upon the transfer of the secured property in complete satisfaction of a purchase mortgage with an outstanding balance in excess of the fair market value of the property.

[7]Special rules apply for certain tax purposes if the insolvent taxpayer is in bankruptcy proceedings. See, e.g., *Davis v. Commissioner,* 69 T.C. 814 (1978); *Martin v. Commissioner,* 56 T.C. 1294 (1971); *Bloomfield v. Commissioner,* 52 T.C. 745 (1969), supplemental opinion 54 T.C. 554 (1970).

to a sale or exchange of property subject to nonrecourse liabilities. The key distinction is that the taxpayer in the *Crane* situation is not personally liable on the debt in question. Thus, irrespective of the amount by which the debt balance exceeds the fair market value of the underlying property, repossession of the underlying property or sale of the property subject to the debt effects no change in the taxpayer's net worth. Accordingly, the rationale of *Kirby Lumber* is no authority for charging the taxpayer with income under these circumstances. Under *Crane, Tufts,* and *Millar,* gain must be recognized, however, with realization of income premised on treating the repossession as a sale or exchange and including the amount of the nonrecourse liability in the amount realized. Since the income realization is not based on cancellation of indebtedness, we perceive no justification for invoking the insolvency exception. We think that petitioners realized gain upon the repossession of the Ampex equipment irrespective of the solvency of any of the interested parties.[8]

Petitioners' final argument under the first issue is that gain realized by the partners was limited by section 752(c)[9] to the amount by which the fair market value of the equipment exceeded the partners' adjusted bases in their partnership's interests. This argument is without merit. In *Tufts v. Commissioner, supra,* this Court analyzed the scope of section 752(c) in light of the legislative history and the regulations and concluded that section 752(c) was intended to apply to only two situations: "upon the contribution of encumbered property by a partner to

---

[8]Since insolvency is irrelevant, it is unnecessary for us to consider petitioners' argument that in determining the solvency of Equipment Leasing, the net worth of the individual partners should be ignored.

[9]SEC. 752. TREATMENT OF CERTAIN LIABILITIES.

(a) INCREASE IN PARTNER'S LIABILITIES.—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

(b) DECREASE IN PARTNER'S LIABILITIES.—Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

(c) LIABILITY TO WHICH PROPERTY IS SUBJECT.—For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

(d) SALE OR EXCHANGE OF AN INTEREST.—In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

the partnership, and upon the distribution of encumbered property by the partnership to a partner." 70 T.C. 756, 768 (1978).[10] Neither of these factual variations is present here. Accordingly, section 752(c) is inapplicable to petitioners' case.[11]

The second issue for our decision is whether the gain realized by Equipment Leasing upon the repossession is characterized as ordinary income pursuant to the provisions of section 1245.[12]

[10]Although *Tufts* dealt with a taxable disposition of a partnership interest, and petitioners' case involves a taxable disposition of a partnership asset, the logic of *Tufts* applies with equal force here. The legislative history and regulations contain no affirmative indication that sec. 752(c) should limit gain realized upon the sale of partnership assets. Furthermore, as explained in *Tufts*, the rationale underlying sec. 752(c) was to codify the *Crane* doctrine and this objective would be frustrated by applying sec. 752(c) to petitioners' case.

[11]Petitioners' reliance on *Stackhouse v. Commissioner*, 441 F.2d 465 (5th Cir. 1971), for the proposition that sec. 752(c) applies here, is misplaced. *Stackhouse* involved income arising from cancellation of indebtedness arising under sec. 61(a)(12). In considering the interplay between secs. 752(c) and 61(a)(12), the Fifth Circuit concluded that gain was recognized only to the extent the debt discharge exceeded the partners' bases in the partnership. The Fifth Circuit did not address the scope of sec. 752(c) or the effect of sec. 752 on income arising from a taxable disposition of property. Accordingly, *Stackhouse* is factually and legally inapposite and does not support petitioners' interpretation of sec. 752(c).

[12]SEC. 1245. GAIN FROM DISPOSITIONS OF CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—

(1) ORDINARY INCOME.—Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of—

(A) the recomputed basis of the property, or

(B)(i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

(ii) in the case of any other disposition, the fair market value of such property,

exceeds the adjusted basis of such property shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. Such gain shall be recognized notwithstanding any other provision of this subtitle.

(2) RECOMPUTED BASIS.—For purposes of this section, the term "recomputed basis" means—

(A) with respect to any property referred to in paragraph (3)(A) or (B), its adjusted basis recomputed by adding thereto all adjustments, attributable to periods after December 31, 1961,

(B) with respect to any property referred to in paragraph (3)(C), its adjusted basis recomputed by adding thereto all adjustments, attributable to periods after June 30, 1963,

(C) with respect to livestock, its adjusted basis recomputed by adding thereto all adjustments attributable to periods after December 31, 1969, or

(D) with respect to any property referred to in paragraph (3)(D), its adjusted basis recomputed by adding thereto all adjustments attributable to periods beginning with the first month for which a deduction for amortization is allowed under section 169 or 185

reflected in such adjusted basis on account of deductions (whether in respect of the same or other property) allowed or allowable to the taxpayer or to any other person for depreciation, or for amortization under section 168, 169, 184, 185, 187, or 188. For purposes of the preceding sentence, if the taxpayer can establish by adequate records or other sufficient evidence that the amount allowed for depreciation, or for amortization under section 168, 169, 184, 185, 187, or 188, for any period was less than the amount allowable, the amount added for such period shall be the amount allowed.

(3) SECTION 1245 PROPERTY.—For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either—

(A) personal property,

Section 1245 provides the general rule that gain upon the disposition of personal property is taxable as ordinary income to the extent of depreciation taken on that property subsequent to 1961. Respondent contends that since the Ampex equipment was personal property for which Equipment Leasing claimed depreciation of $779,986.20 subsequent to 1961, the entire gain of $677,916.27 realized upon the repossession is characterized by section 1245 as ordinary gain. We agree with respondent.

Petitioners present three arguments, none of which has any merit, against recharacterizing the gain as ordinary income under section 1245. First, they argue that section 1245 is inapplicable since the depreciation allowed on the Ampex equipment did not exceed the true economic decline in the value of the property.[13] As support for this argument petitioners rely on the legislative history of section 1245:

> Under present law, in the case of depreciable property the taxpayer may write off the cost or other basis of the property over the period of the useful life of the asset in his hands. This cost or other basis can be written off evenly (or in a "straight line" over the asset's life), under the declining balance method, under the sum-of-the-year's digits method, or under any other consistent method which does not during the first two-thirds of the useful life of the property exceed the allowances which would have been allowed under the declining balance method. This depreciation deduction is a deduction against ordinary income. If either the useful life of the asset is too short, or the particular method of depreciation allows too much depreciation in the early years, the decline in value of the asset resulting from these depreciation deductions may exceed the actual decline of the value of the asset. Wherever the depreciation deductions reduce the basis of the property faster than the actual decline in its value, then when it is sold there will be a gain. Under present law this gain is taxed as a capital gain, even though the depreciation deductions reduced ordinary income. The taxpayer who has taken excessive depreciation deductions and then sells an asset, therefore, has in effect converted ordinary income into a capital gain. [H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 470–471; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 801 (1962).]

From this petitioners surmise that congressional intent underlying section 1245 was recapture of depreciation as ordinary income only when depreciation deductions exceed the actual decline in the value of the asset. We disagree. The committee

---

[13]After depreciation deductions, Equipment Leasing's basis in the equipment purchased for $1,284,612 was $504,625.80. The fair market value of the equipment was $400,000. Therefore, petitioners contend, the actual economic decline in the property value was greater than the depreciation, and no recapture should occur.

report merely presents the most frequent factual situation which will give rise to the application of section 1245. The statute itself contains no indication supporting the limitation petitioners seek to impose on its application. Moreover, the thrust of congressional intent underlying section 1245 was to prevent conversion of ordinary income into capital gain. Applying the unequivocal language of the statute to petitioners' case, this objective is achieved. Absent application of section 1245, petitioners' gain would be taxed as capital gain, even though depreciation deductions previously claimed reduced ordinary income. Thus, both the statutory language and underlying congressional intent support application of section 1245 to the gain realized by Equipment Leasing upon the repossession of the Ampex equipment.

Petitioners' second argument under this issue is that if section 1245 is applicable, subsection 1245(a)(1)(B)(ii) is the controlling provision rather than subsection 1245(a)(1)(B)(i). We disagree. Subsection 1245(a)(1)(B)(i) provides that the amount realized (if lower than recomputed basis) is used in computing recapture of depreciation in the case of a "sale, exchange, or involuntary conversion." Subsection 1245(a)(1)(B)(ii) provides that "in the case of any other disposition" the fair market value (if less than recomputed basis)[14] of such property is used. The general rule for purposes of Federal income taxation is that a repossession is a "sale or exchange." See *Helvering v. Hammel*, 311 U.S. 504, 506–511 (1941); *R. O'Dell & Sons Co. v. Commissioner*, 169 F.2d 247, 248 (3d Cir. 1948); *Unique Art Manufacturing Co. v. Commissioner*, 8 T.C. 1341, 1342–1343 (1947). We think the same rule applies for purposes of section 1245.

The legislative history indicates that the congressional intent underlying subsection 1245(a)(1)(B) was to recapture depreciation on all dispositions of property. On a sale, exchange, or involuntary conversion of property, gain is realized by the excess of amount realized over adjusted basis; consequently, the "amount realized" is available as a frame of reference for computing depreciation recapture as provided in section 1245(a)(1)(B)(i). For certain other dispositions, however, there is no amount realized; examples of such dispositions include

_____

[14]Here, both the amount realized and the fair market value are less than a recomputed basis.

corporate transfers of section 1245 property as dividends or liquidating distributions to shareholders. To make certain that depreciation would also be recaptured in such situations, subsection 1245(a)(1)(B) was drafted in two parts with subsection 1245(a)(1)(B)(ii) providing fair market value as the frame of reference if no amount is realized. See H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 471–475; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 802–806, 985. Here no reference to fair market value is necessary. The repossession constituted a sale or exchange in which the amount realized by Equipment Leasing is the pertinent figure for purposes of section 1245. Therefore, subsection 1245(a)(1)(B)(i) rather than subsection 1245(a)(1)(B)(ii) applies to this case.

Petitioners' third argument under this issue is that if subsection 1245(a)(1)(B)(i) is applicable here, the amount realized on the repossession of the Ampex equipment was equal to its fair market value. Their argument is based on their contention that any excess of the nonrecourse debt over the fair market value of the equipment constitutes income from the discharge of indebtedness rather than gain from dealings in property. This argument has been fully explored and rejected above; a repeat of that discussion here is unnecessary. None of the income arising from the repossession is cancellation of indebtedness income. The entire balance of the nonrecourse liability constitutes the amount realized by petitioner and that figure is appropriate for use in computing recapture under section 1245. Accordingly, the entire amount of the gain realized by petitioner upon the repossession of the Ampex equipment is recaptured as ordinary income pursuant to section 1245.

The final issue for our decision is whether recognition of the gain realized by Equipment Leasing upon the repossession may be deferred pursuant to sections 108 and 1017. Section 108[15]

---

[15]SEC. 108. INCOME FROM DISCHARGE OF INDEBTEDNESS.

(a) SPECIAL RULE OF EXCLUSION.—No amount shall be included in gross income by reason of the discharge, in whole or in part, within the taxable year, of any indebtedness for which the taxpayer is liable, or subject to which the taxpayer holds property, if—

(1) the indebtedness was incurred or assumed—

(A) by a corporation, or

(B) by an individual in connection with property used in his trade or business, and

(2) such taxpayer makes and files a consent to the regulations prescribed under section 1017 (relating to adjustment of basis) then in effect at such time and in such manner as the Secretary or his delegate by regulations prescribes.

provides deferral of recognition of income arising from the discharge of certain indebtedness for which the taxpayer is liable, or subject to which the taxpayer holds property[16] if the taxpayer properly elects to make adjustments to basis as prescribed in the regulations under section 1017.[17] Respondent questions whether sections 108 and 1017 are applicable to the type of gain realized by petitioners upon the repossession but places primary reliance on the rule that gain recaptured as ordinary income under section 1245 "shall be recognized notwithstanding any other provision of this subtitle." (Sec. 1245(a) and (d).) Petitioner, on the other hand, repeats his argument that section 1245 is inapplicable to the gain realized upon the repossession since, to the extent the nonrecourse debt exceeded the fair market value of the property, income arose from the discharge of indebtedness under section 61(a)(12).[18] Our resolu-

---

In such case, the amount of any income of such taxpayer attributable to any unamortized premium (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be included in gross income, and the amount of the deduction attributable to any unamortized discount (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be allowed as a deduction.

[16]The language of the statute clearly indicates that under certain circumstances discharge from nonrecourse liabilities can give rise to discharge of indebtedness income. We do not think, however, that this is at variance with our holding under the first issue here that the income realized upon the *transfer* of the Ampex equipment was not income from the cancellation of indebtedness. The language in sec. 108 refers to discharge of indebtedness subject to which the taxpayer holds property. If such nonrecourse indebtedness is canceled and the taxpayer continues to hold the underlying property he may indeed receive an increase in net worth and an "accession to income" as contemplated in *United States v. Kirby Lumber*, 284 U.S. 1, 3 (1931), and under those circumstances, has received income from the discharge of indebtedness.

[17]SEC. 1017. DISCHARGE OF INDEBTEDNESS.

Where any amount is excluded from gross income under section 108(a) (relating to income from discharge of indebtedness) on account of the discharge of indebtedness the whole or a part of the amount so excluded from gross income shall be applied in reduction of the basis of any property held (whether before or after the time of the discharge) by the taxpayer during any portion of the taxable year in which such discharge occurred. The amount to be so applied (not in excess of the amount so excluded from gross income, reduced by the amount of any deduction disallowed under section 108(a)) and the particular properties to which the reduction shall be allocated, shall be determined under regulations (prescribed by the Secretary or his delegate) in effect at the time of the filing of the consent by the taxpayer referred to in section 108(a). The reduction shall be made as of the first day of the taxable year in which the discharge occurred, except in the case of property not held by the taxpayer on such first day, in which case it shall take effect as of the time the holding of the taxpayer began.

[18]As support for this contention, petitioners point to sec. 1.1017-1(b)(5), Income Tax Regs., which provides as follows:

"Whenever a discharge of indebtedness is accomplished by a transfer of the taxpayer's property in kind, the difference between the amount of the obligation discharged and the fair market value of the property transferred is the amount which may be applied in reduction of basis;"

Although dividing income into a component of gain arising from the sale or exchange and a component of income arising from the discharge of indebtedness may be appropriate if the transfer of property discharges a debt on which a taxpayer is personally liable (see discussion in n. 6 *supra*), it is

tion of the first two issues requires a holding for respondent on the final issue as well.

The gain realized by Equipment Leasing upon the repossession was not income from discharge of indebtedness. The income arose from a repossession of the Ampex equipment which constituted a sale or exchange for tax purposes. The amount realized by Equipment Leasing was the entire balance of the nonrecourse liability. The gain realized is characterized as ordinary income pursuant to section 1245. Since the gain is not includable "in gross income by reason of the discharge" of indebtedness, sections 108 and 1017 are not available to defer recognition of the gains.[19] See *Spartan Petroleum Co. v. United*

---

inappropriate here since the debt was nonrecourse. The regulation does not explicitly limit its application, but we think that the statutory framework implicitly excludes application of the regulation to this case. The presence of income from the cancellation of indebtedness is a prerequisite to application of secs. 108 and 1017, and as explored under the first issue, no such income arose here.

[19]In holding that secs. 108 and 1017 are applicable only if the income arose by reason of the discharge of indebtedness, we are not unmindful of the legislative history of these sections. The predecessors of these sections were secs. 22(b)(9) and 113(b)(3) of the Internal Revenue Code of 1939, which excluded from gross income amounts realized by corporations as income from the discharge of indebtedness evidenced by a security if an election to adjust the basis of the corporation's property was made. Secs. 22(b)(9) and 113(b)(3) were enacted as a relief provision for corporations in unsound financial condition. See H. Rept. 855, 76th Cong., 1st Sess. 4–5, 23–25 (1939).

Secs. 108 and 1017 substantially extended the availability of the relief to defer income arising from the discharge of any indebtedness incurred by a corporation and indebtedness incurred by individuals in connection with property used in his trade or business. The House bill specified that the deferral provisions would be inapplicable—

"(A) to the amount of income attributable to the discharge of indebtedness, to the extent that such discharge is effected in consideration of property transferred or services rendered by the taxpayer, or

"(B) to amounts includible in gross income under section 76(b) (relating to certain items previously deducted)."

Sec. 76 of the House bill provided specific statutory rules for determining under which circumstances discharge of indebtedness would result in gross income.

The Senate dropped both sec. 76 and the exceptions in sec. 108 quoted above, with the following explanation:

"In the House bill, however, income attributable to the discharge of an indebtedness may not be excluded [under sec. 108] to the extent that such discharge was effected in consideration of the transfer of property or the rendering of services. Nor is income excludable if it is includible under section 76(b). Accordingly, the income, which is includible because the debtor had derived a tax benefit by the prior deduction of the indebtedness discharged, could not be excluded even though the debtor consents to a corresponding reduction of the basis of his property. Your committee has eliminated these restrictions since they were connnected with section 76 which has been removed from the bill. [S. Rept. 1635, 83d Cong., 2d Sess. 186 (1954).]"

Since the Senate version of sec. 108 was the one adopted in the Code, standing alone this excerpt may appear to support the inference that sec. 108 was intended to have a broader application than its terms suggest. This inference is negated, however, by the explicit language in the Senate report tying elimination of the House limitations in sec. 108 with removal of sec. 76 of the House bill; disagreement over sec. 76 led to its elimination from the Code, but this elimination may not be viewed as a ratification of the apparent views in the Senate Finance Committee's Report of what should constitute income from the discharge of indebtedness. The Conference Report indicates that the effect of eliminating sec. 76 was that the determination of what constitutes income from the

*States,* 437 F. Supp. 733, 737 (D.S.C. 1977). Alternatively, section 1245 requires recognition of the income notwithstanding sections 108 and 1017.

Accordingly, we hold that petitioners must recognize as ordinary income in the taxable year 1973 their distributive shares of the $677,916.27 gain realized as a result of the repossession of the Ampex equipment.

*Decision will be entered for the respondent.*

---

discharge of indebtedness "will be made, as under existing law, by applying the general rules for determining gross income." Conf. Rept. 2543, 83d Cong., 2d Sess. 23 (1954). We have relied on the general rules for determining gross income and the express language of the statute in concluding that sec. 108 is applicable only to income from the discharge of indebtedness and that the gain realized by Equipment Leasing does not constitute such income.