638

OKC CORP. AND SUBSIDIARIES, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

OKC REFINING, INC. (FORMERLY OKMULGEE REFINING CO.,
INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 15099–80, 15100–80.    Filed April 25, 1984.

*Kemble White,* for the petitioners.
*Rebecca W. Wolfe,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Docket No. | Petitioner | TYE Sept. 30— | Deficiency |
|---|---|---|---|
| 15100–80 | OKC Refining, Inc. | 1967 | $328,827.26 |
| | | 1968 | 459,287.61 |
| 15099–80 | OKC Corp. and Subsidiaries | 1969 | 109,383.56 |
| | | 1970 | 7,472.56 |
| | | 1971 | 713,954.58 |

After concessions by the parties, the issues remaining for decision are: (1) Whether OKC Refining, Inc., must recognize income on the discharge during 1971 of indebtedness owed by it; and (2) whether the alkylation unit built by OKC Refining, Inc., during 1969 is eligible for the investment tax credit under

section 49 of the Internal Revenue Code of 1954.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

Petitioner OKC Corp. (OKC) is a corporation organized under the laws of the State of Delaware with its principal place of business at Dallas, Tex., when it filed its petition. OKC and its subsidiaries filed their consolidated Federal corporate income tax returns for their taxable years ended September 30, 1969, September 30, 1970, and September 30, 1971, with the Internal Revenue Service Center, Austin, Tex. We shall refer to a taxable year by the year in which it ends. Petitioner OKC Refining, Inc. (formerly Okmulgee Refining Co., Inc.) (Refining) is a wholly owned subsidiary of OKC having its principal place of business in Dallas, Tex., when it filed its petition. Refining filed Federal corporate income tax returns for its taxable years ended September 30, 1967, and September 30, 1968, with the Internal Revenue Service Center, Austin, Tex.

During 1966, OKC (then known as Oklahoma Cement Co.) manufactured portland cement at plants in Oklahoma and Louisiana. Most of the cement sold by OKC was used in road building. During 1966, OKC became interested in acquiring an oil refinery. Such an acquisition would allow OKC to produce asphalt, and thus offer its customers a complete line of road building products.

Prior to 1966, the Phillips Petroleum Co. (Phillips) owned and operated a small oil refinery at Okmulgee, Okla. Phillips was not making a profit on that refinery. Bob Hulsey, a petroleum consultant, approached OKC president Cloyce Box with the proposal that OKC, acting as a small, independent refiner, might more profitably operate the Okmulgee refinery. OKC entered into negotiations with Phillips for the purchase of the refinery. To evaluate the profitability of the proposed acquisition, OKC retained Mr. Hulsey who in turn hired the consulting engineering firm of Purvin & Gertz, Inc.

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

In the report it prepared for Mr. Hulsey in July 1966, Purvin & Gertz reviewed three potential ways in which OKC might operate the refinery. The engineers concluded that the most profitable method of operation involved the installation of an HF alkylation unit permitting the production of more high octane premium gasoline. Purvin & Gertz also stated that if OKC qualified for the oil import quota, it could earn $1,133,000 per year on the sale of oil import "tickets."

The crude oil import quota was established during the 1950's to protect the U.S. oil industry from harmful competition from cheaper foreign oil, primarily from the Middle East, and to allow oil refineries which lacked port facilities and pipelines, access to the cheaper oil. The Oil Import Administration (OIA) of the Department of the Interior governed the allocation of oil import licenses (or tickets) to refinery or petrochemical plant operators, and the formula under which such allocations were made could be changed each year. The import licenses were usually issued for a period of 1 year. Each ticket represented the right to import one barrel of oil, and under the allocation formula, a smaller, independent refinery was entitled to more tickets than a larger, integrated producer such as Phillips. The value of a ticket was measured by the difference between the cost of domestically produced crude oil and the cost of imported oil delivered to the United States. Although Interior Department regulations forbade the sale of oil import quotas, an inland refiner could realize their value by exchanging them for the inland production of a refiner with port facilities.

The Purvin & Gertz report also noted that OKC's operation of the refinery might qualify for the Department of Defense small business "set aside" for jet fuel contracts. The report stated that the "set aside" assured the small refiner of an outlet for its jet fuel production.

Based upon the Purvin & Gertz report and upon his own study, on July 25, 1966, Mr. Hulsey recommended that OKC form a wholly owned subsidiary to purchase the Okmulgee refinery from Phillips. He recommended the following purchase terms:

I. Purchase price not to exceed $8,860,000 as follows:

A. Present facilities, land, etc. at Phillips'
    book at time of purchase                     $4,500,000

B. 1,500 BPD – HF Alkylation Unit (to be
    constructed)                                   1,500,000

C. Inventories necessary for 45 days' operation
    at 16,000 BPD at Phillips' cost           2,860,000

II. The new company (Purchaser) to enter into a contract with Phillips through which Phillips agrees to provide a market for all products as necessary other than asphalt and jet fuel.

III. Purchaser will retain all the present refinery operating personnel including the Plant Manager.

IV. Purchaser will enter into an agreement with Phillips whereby crude imported by Purchaser under quota will be exchanged for Oklahoma crude. It was assumed for the purpose of this study that Purchaser would receive the equivalent of $1.25 per barrel on 2,484 BPD.

V. Phillips will assist Purchaser in obtaining 100% financing for this acquisition.

On the basis of these provisions and conditions, a payout of the purchase of less than 5 years is anticipated. This payout is based on prices consistent with 1965 – 1966 levels and assumes an interest rate of 5% on the financing and payment of $525,000 royalty on the alkylation unit.

During the negotiations for the purchase of the refinery, representatives of both Phillips and OKC recognized that unless OKC could obtain import quotas as a small refinery, "it would be uneconomical for Oklahoma Cement to consider the purchase of the Okmulgee refinery from Phillips." Accordingly, on September 30, 1966, OKC and Phillips sent a letter to the OIA requesting assurance that OKC would obtain the necessary import quotas. The OIA objected to several aspects of the proposed transactions and required, among other things, that Phillips not purchase more than 50 percent of total refinery output. On October 29, 1966, the OIA advised OKC that OKC would qualify for the oil import quota.

During the negotiations, Phillips and OKC contemplated that, after OKC acquired the refinery, Phillips would supply

crude oil to it and would purchase a portion of its output. During October 1966, the parties continued to negotiate the refinery purchase price as well as the prices to be charged under the crude oil supply contract and the refined products sales contract. Mr. Hulsey recommended that OKC should not purchase the refinery unless OKC could be reasonably certain of retiring the purchase money debt within 5 years. Without the quota income, OKC would be unable to make the anticipated principal payments and would be unable to retire the debt within 5 years.

The estimates of the refinery's profitability were based on projections of the future value of the oil import quotas as well as the future prices for crude oil (refinery input) and the future prices for refined products (refinery output). The price of the refinery was set at an amount that the parties believed, based on 1966 projections, could be fully paid by the profits generated within 5 years of the sale. At the time of the negotiations, the total value of the refinery and inventory was approximately $6.5 million consisting of a value of $4.5 million for the refinery itself (measured by its anticipated quota income) and approximately $2 million for the inventory on hand.

By the end of October 1966, OKC and Phillips had completed negotiations for the transfer of the Okmulgee refinery. On October 31, 1966, the directors of OKC resolved to create Refining as a wholly owned subsidiary. Refining has an initial paid-in capital of $50,000. On the same date, Refining and Phillips executed several written agreements to effectuate the transfer of the refinery. A general agreement provided that if Refining failed to receive its anticipated oil import quota before January 1, 1967, all the agreements between Phillips and Refining were to be rescinded.

The agreement of sale provided that Refining would purchase the refinery properties for $4.5 million and the crude oil inventories for a total to be determined and paid prior to January 1, 1967. Refining borrowed the purchase money for the refinery from the First National City Bank of New York (the bank). The interest rate was 6½ percent per year; the principal was payable in quarterly installments of $125,000. Refining also agreed to make an additional annual payment equal to 75 percent of the prior year's after-tax cash flow from

refinery operations. Phillips agreed to purchase the note from the bank upon the happening of a number of contingencies, including certain specified events of default; additionally, the bank could require Phillips to purchase the note at any time within 3 months prior to October 31, 1971, regardless of a default. The bank agreed to sell the note to Phillips at any time upon Phillips' written request. Refining financed the inventory purchase with a loan of $2 million from Phillips.

Pursuant to the output sales contract, Phillips agreed to purchase 49 percent of the refinery's production. The term of the original contract expired on December 31, 1971, but the contract could be extended from year to year thereafter. The contract provided that the price for each product would be the average of the low quotations for such product in Platt's Oilgram Northern Shipment, less a discount equal to 50 or 75 percent of the amount by which such average exceeded a specified amount.

Pursuant to the crude oil supply contract, Phillips agreed to furnish the refinery's crude oil requirements up to 16,000 barrels per day. The cost of the crude oil to Refining was to be Phillips' cost where Phillips purchased the oil from another producer, or Phillips' posted price where Phillips produced the oil, plus transportation. The supply contract expired on December 31, 1971, but it could also be extended from year to year thereafter.

Shortly after the sale of the Okmulgee refinery, a dispute arose between Refining and Phillips concerning the price Phillips charged for crude oil and the prices Phillips paid for Refining's output. Since Phillips charged more than Refining had anticipated for the crude oil supplied to the refinery, Refining requested that Phillips increase the prices that Phillips paid for the refinery output. Without the price increase, Refining would be unable to retire its debt in 5 years. Accordingly, on March 10 and April 3, 1967, Phillips approved a price amendment to the output sales contract; such amendment was executed on April 28, 1967. Phillips agreed to subsequent price increases for the periods November 1, 1967, through October 31, 1968, and November 1, 1968, through October 31, 1969.

During the fall of 1969, Refining continued to negotiate with Phillips regarding the prices that Phillips would pay for

Refining's products. Refining's officers were concerned that the oil import quota program would be abolished, thus depriving the company of its quota income. Moreover, increases in the costs of foreign oil and transportation had caused the value of Refining's import quota to decline steadily after 1966. Accordingly, Refining had realized less income on the oil import licenses than it anticipated when it acquired the Okmulgee refinery.

Phillips was also concerned that it could no longer afford to subsidize the refinery operations. Phillips estimated that it had paid Refining $2.5 million in excess of market value for Refining's output. After November 1, 1969, Phillips again began paying for Refining's output at the prices established in the 1966 contract. Phillips was eager to terminate its relationship with Refining, but the parties were unable to agree to a satisfactory method of termination. The price dispute remained unresolved, and during July 1970, Refining began reducing its payments to Phillips for crude oil by the amounts that it claimed were due it for refined products. On March 12, 1971, Phillips informed Refining that it would cease delivery of crude oil on April 1, 1971.

By 1971, the value of the oil import quotas had declined so that the refinery's value, measured by its anticipated quota income, was only $2 million to $2.5 million.

On March 30, 1971, Refining filed suit against Phillips in an Oklahoma court alleging that in 1966, it had orally agreed with Phillips to buy the refinery at a price equal to an amount that the refinery's cash flow could repay in 5 years and that Phillips had agreed to purchase the refinery output at a price sufficient to guarantee the necessary cash flow. Refining alleged that because of a mutual mistake, the output contract did not express such oral agreement. Refining alleged that the three modifications of the output contract represented further attempts to conform their written agreement to the actual agreement. Refining alleged that Phillips had breached the actual agreement after November 1, 1969, because it had refused, since that time, to pay a price for refined products that would generate the necessary cash flow. Finally, Refining alleged that Phillips was threatening to cease crude oil deliveries and that such action threatened to close the refinery. Refining sought judgment enjoining Phillips from ceasing

crude oil delivery and reforming the written output contract to conform to the parties' original intent.

At the time Refining commenced its lawsuit, Gary Davis was senior counsel to Phillips. Mr. Davis believed that Phillips would win the lawsuit, but he was concerned that if Refining prevailed, Phillips could be forced to subsidize an unprofitable operation indefinitely.

On September 1, 1971, Refining and Phillips executed a settlement agreement which canceled most of the contracts arising from the sale of the refinery. Phillips agreed to acquire and forgive the debt that Refining owed to the bank, which then had an unpaid principal balance of $1,397,567.73, and to forgive the inventory debt that Refining owed to Phillips, which then had an unpaid principal balance of $1,257,522.57, as well as any accrued, unpaid interest on the debts. Phillips agreed to supply crude oil to the refinery until January 31, 1973, and to purchase the refinery's output until December 31, 1971. The parties intended the settlement agreement to "fully settle all differences between them" concerning the amounts Phillips owed for refined products and the amounts Refining owed for its crude oil purchases. On September 10, 1971, Refining's lawsuit was dismissed.

When Refining purchased the Okmulgee refinery in 1966, it contemplated the addition of an alkylation unit to the refinery. An alkylation unit chemically combines two small gaseous molecular components into a high octane blending component used by the refinery to produce high octane gasoline. The unit can operate independently from the rest of the refinery, using feed stocks (inputs) obtained from other sources, or it can run on feed stocks taken directly from other units in the refinery. Prior to the construction of the unit, Refining and Phillips operated the refinery by purchasing the components necessary to obtain the higher octane ratings.

On July 31, 1968, Refining's engineering staff prepared an authorization for expenditure of $1.5 million to construct the alkylation unit. In late 1968, Refining commenced negotiations with Phillips to obtain the license necessary to construct the alkylation unit. On March 4, 1969, Refining issued a purchase order for test borings at the proposed site. Early in March 1969; refinery employees staked out the site, and the drillers took test borings. On March 19, 1969, the drillers

issued their report. On March 27, 1969, Refining solicited bids on the project, requesting the submission of the bids by May 12, 1969.

On May 7, 1969, Refining's board of directors authorized the execution of a $1.5 million loan. On May 28, 1969, Refining chose a contractor and instructed it to proceed with the construction of the alkylation unit. On August 1, 1969, Refining borrowed $1.5 million from the bank to finance the construction of the alkylation unit. The unit was placed in service during 1970.

The alkylation unit was self-contained and was located on a single site which was separated from the rest of the refinery. Its function may be analogized to that of an ethanolamines unit.

On the consolidated return for 1971, Refining elected to treat the discharge of its indebtedness pursuant to sections 108 and 1017; accordingly, Refining did not report such debt discharge as income but instead reduced the basis of the refinery assets. On the consolidated return for 1970, Refining claimed an investment tax credit in the amount of $101,135.80 for the construction of the alkylation unit. In his notices of deficiency, the Commissioner determined that Refining should have recognized income during 1971 in the amount of the discharged debts and that the alkylation unit was not eligible for the investment tax credit because it was not section 38 property.

## OPINION

The first issue for decision is whether Refining must recognize income on the discharge during 1971 of the debts it owed in connection with the refinery purchase. The petitioners contend that the debt discharge constituted a retroactive reduction of the purchase price of the refinery as a result of which Refining realized no income. See *Helvering v. A. L. Killian Co.*, 128 F.2d 433 (8th Cir. 1942), affg. 44 B.T.A 169 (1941); *Hirsch v. Commissioner*, 115 F.2d 656 (7th Cir. 1940), revg. 41 B.T.A. 890 (1940). Alternatively, they urge that Refining properly elected to defer recognition of the discharge of indebtedness income pursuant to sections 108 and 1017.[2]

---

[2] We observe that the petitioners' alternative arguments both result in the same tax treatment of

The Commissioner asserts that the 1971 transaction by which Refining's debts were canceled was not a retroactive reduction in the purchase price of the refinery. The Commissioner also asserts that sections 108 and 1017 do not apply to such transactions. He contends that the income realized upon the discharge of the debts did not arise *by reason of* their discharge. Sec. 108. Instead, the Commissioner claims that Phillips used the debt cancellation to settle the lawsuit which arose out of the dispute over the price to be paid for Refining's products. The Commissioner concludes that such a "payment" in settlement of the lawsuit represented Refining's lost profits and hence was ordinary income.

Generally, when a solvent debtor's fixed obligation is reduced or canceled, the amount of the reduction or cancellation constitutes income. Sec. 61(a)(12); *Commissioner v. Jacobson*, 336 U.S. 28 (1949); *Helvering v. American Chicle Co.*, 291 U.S. 426 (1934); *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931). Courts have on occasion recognized an exception to the *Kirby Lumber* principle where the buyer of property negotiates with the seller/creditor for a discharge of all or part of the purchase money indebtedness to reflect a decline in the value of the property. The resulting discharge of indebtedness has been characterized not as income but as a retroactive reduction of the purchase price. See *Helvering v. A. L. Killian Co., supra*; *Hirsch v. Commissioner, supra*; *Gehring Publishing Co. v. Commissioner*, 1 T.C. 345 (1942).

The rule of *Kirby Lumber* is clearly applicable where the only relationship between the parties is that of debtor and creditor and where the creditor is willing to accept less than full payment in discharge of the debt because of his concerns about the debtor's solvency, or because a rise in interest rates has devalued the loan. However, in many cases, the parties' transactions involve more than just a debtor-creditor relationship. See Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225, 231 (1959). The cancellation of a debt may not

---

the 1971 transaction—no income is recognized as a result of the debt cancellation, but the basis of the refinery assets is reduced by the amount forgiven. Secs. 108, 1017; sec. 1.1017–1(a)(1), Income Tax Regs.; *Hirsch v. Commissioner*, 115 F.2d 656 (7th Cir. 1940), revg. 41 B.T.A. 890 (1940): *Montgomery v. Commissioner*, 65 T.C. 511, 521 (1975); see Bittker & Thompson, "Income from the Discharge of Indebtedness: the Progeny of *United States v. Kirby Lumber Co.*," 66 Cal. L. Rev. 1159, 1170 (1978).

be, in and of itself, the source of income but may simply be the method by which a creditor makes a payment to a debtor. *Spartan Petroleum Co. v. United States*, 437 F. Supp. 733 (D. S.C. 1977); see generally Bittker & Thompson, "Income From the Discharge of Indebtedness: The Progeny of *United States v. Kirby Lumber*," 66 Cal. L. Rev. 1159, 1174–1179 (1978). Whether such payment is ordinary income to the debtor depends upon the nature of the payment. For example, a discharge of indebtedness may constitute a payment for services (*Newmark v. Commissioner*, 311 F.2d 913, 915 (2d Cir. 1962), affg. a Memorandum Opinion of this Court; *Tucker v. Commissioner*, 69 T.C. 675 (1978); *Denny v. Commissioner*, 33 B.T.A. 738 (1935)[3]); or a constructive dividend (*Shephard v. Commissioner*, 340 F.2d 27 (6th Cir. 1965), affg. per curiam a Memorandum Opinion of this Court; *Wiese v. Commissioner*, 93 F.2d 921 (8th Cir. 1938), affg. 35 B.T.A. 701 (1937); *Haber v. Commissioner*, 52 T.C. 255 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970)), in which cases such discharge is ordinary income. On the other hand, a discharge of indebtedness may constitute a contribution to capital (sec. 1.61–12(a), Income Tax Regs.; *Perlman v. Commissioner*, 252 F.2d 890 (2d Cir. 1958), affg. 27 T.C. 755 (1957); *Commissioner v. Auto Strop Safety Razor Co.*, 74 F.2d 226 (2d Cir. 1934), affg. 28 B.T.A. 621 (1933); *Putoma Corp. v. Commissioner*, 66 T.C. 652 (1976), affd. 601 F.2d 734 (5th cir. 1979)) or a gift (see *Helvering v. American Dental Co.*, 318 U.S. 322 (1943); *Reynolds v. Boos*, 188 F.2d 322 (8th Cir. 1951); *Capitol Coal Corp. v. Commissioner*, 26 T.C. 1183 (1956), affd. 250 F.2d 361 (2d Cir. 1957)), in which cases the forgiveness of indebtedness is not income to the debtor. The discharge of a debt may also represent a payment for property (*Spartan Petroleum Co. v. United States, supra*), in which case the gain, if any, is derived from dealings in property, not from the discharge of indebtedness (*Danenberg v. Commissioner*, 73 T.C. 370 (1979); *Estate of Delman v. Commissioner*, 73 T.C. 15 (1979)). Finally, a discharge of indebtedness may constitute a payment for the settlement of a litigated claim. *Commercial Electrical Supply Co. v. Commissioner*, 8 B.T.A. 986 (1927).[4]

---

[3]See also *Silver v. Commissioner*, T.C. Memo. 1961–6.

[4]See also *Lieb v. Commissioner*, T.C. Memo. 1974–272, affd. in an unpublished opinion 535 F.2d 1246 (3d Cir. 1976).

During the years in issue, section 108 provided that a taxpayer could exclude income arising "by reason of the discharge * * * of any indebtedness" if the taxpayer agreed to apply the amount so excluded in reduction of the basis of his property pursuant to section 1017. However, section 108 only applies to "pure" cancellation of indebtedness income (see Eustice, *supra* at 284–285); it does not apply if the debt forgiveness is simply the method by which a creditor makes a payment to a debtor. *Spartan Petroleum Co. v. United States*, 437 F. Supp. at 737; Bittker & Thompson, *supra* at 1186.[5] Thus, we must examine all the surrounding circumstances to determine whether the discharge of indebtedness results in "pure" income therefrom or whether the debt is discharged as a means of making an indirect payment for services, property, or other purposes.

Phillips canceled principal indebtedness totaling over $2.6 million owed it[6] by Refining as part of the settlement of the lawsuit. Where a payment is made in settlement of litigation, the nature of the claims involved and the basis of the recovery determine the tax treatment of the settlement proceeds. *Lyeth v. Hoey*, 305 U.S. 188 (1938); *Raytheon Production Corp. v. Commissioner*, 144 F.2d 110 (1st Cir. 1944), affg. 1 T.C. 952 (1943); *Henry v. Commissioner*, 62 T.C. 605 (1974); *Freeman v. Commissioner*, 33 T.C. 323 (1959). The same rule obtains in the present case where the settlement was paid by a debt discharge. See *Commercial Electrical Supply Co. v. Commissioner*, *supra*. Thus, the rule of *Kirby Lumber* and its exceptions, judicial and statutory,[7] have no application to the present

---

[5]While drafting the 1954 Code, Congress rejected as premature an attempt to codify the rules regarding discharge of indebtedness income, including a provision which would have expressly made sec. 108 inapplicable to the cancellation of indebtedness in consideration of a transfer of property or the performance of services. Congress expressly left the development of the law concerning income from the discharge of indebtedness, including the proper scope of sec. 108, to future judicial development. See H.R. 8300, 83d Cong., 2d Sess., secs. 76, 108(a)(2) (Mar. 9, 1954), deleted by Senate amendments Nos. 24, 33 (June 18, 1954); H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. A28–29, A35 (1954); Hearings on H.R. 8300 Before the Senate Comm. on Finance, 83d Cong., 2d Sess. 624–626 (statement of the Association of the Bar of the City of New York, Apr. 16, 1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 13–14, 186 (1954); H. Rept. 2543, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 23 (1954). See generally Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A problem of Creeping Confusion," 14 Tax L. Rev. 225, 270–275 (1959).

[6]Of course, Refining owed the purchase money debt to the First National City Bank of New York. The settlement agreement provided that Phillips would buy the note from the bank and then cancel it.

[7]The "purchase price reduction" exception to the *Kirby Lumber* rule was codified at sec. 108(e)(5)

case; the debt discharge did not result in "pure" income from the discharge of indebtedness, and section 108 does not apply to it.

Settlement proceeds may constitute damages for lost profits, earnings, or income, in which case such proceeds are ordinary income. *Agar v. Commissioner*, 290 F.2d 283 (2d Cir. 1961), affg. per curiam a Memorandum Opinion of this Court; *Raytheon Production Corp. v. Commissioner, supra; Hodge v. Commissioner*, 64 T.C. 616 (1975); *Henry v. Commissioner, supra*. Settlement proceeds may also constitute a return of capital or damages for the impairment of capital, in which case the proceeds are taxable only to the extent that they exceed the basis of the property replaced, and then only as capital gain. *Durkee v. Commissioner*, 162 F.2d 184 (6th Cir. 1947), remanding 6 T.C. 773 (1946); *Raytheon Production Corp. v. Commissioner, supra; Fono v. Commissioner*, 79 T.C. 680, 692 (1982); *Bresler v. Commissioner*, 65 T.C. 182 (1975). Finally, settlement proceeds received on account of personal injury are excluded from gross income pursuant to section 104(a)(2). See *Church v. Commissioner*, 80 T.C. 1104 (1983).

The value of the refinery had dropped sharply because rising foreign oil prices caused the value of the oil import quotas to plummet. The petitioners contend that the settlement was intended to restore to Refining a portion of the lost value of the refinery. The petitioners conclude that the settlement did not constitute compensation for lost profits or earnings.

The parties originally anticipated that Refining would pay for the refinery from its import quota earnings. However, Refining's profits were squeezed almost immediately after the sale because the cost of its crude oil input increased while at the same time its oil import quota income decreased. In order to replace the lost import quota profits and thereby timely discharge its debt, Refining sought increases in the prices Phillips paid for refined products under the output contract. Phillips agreed to price increases each year until November 1, 1969. Thereafter, Phillips became concerned that it was paying too much for Refining's output, and it refused to consent to further modifications. Phillips insisted upon paying

by the Bankruptcy Tax Act of 1980, Pub. L. 96–589, 94 Stat. 3393. The statute applies only where the debt discharge would otherwise result in income from the discharge of indebtedness. Sec. 108(e)(5)(C); see S. Rept. 96–1035 (1980), 1980–2 C.B. 620, 628.

prices determined pursuant to the 1966 output contract. The negotiations between Phillips and Refining focused almost exclusively on the price dispute and did not directly concern the decline in the import quota values and in the refinery value. The dispute proved insoluble and culminated in Refining's 1971 lawsuit to reform the output contract.

The object of the lawsuit, according to the petitioners' brief, was "to let Refining make enough to pay for the refinery." It is clear that the essence of Refining's Complaint was that Phillips was not paying enough for the gasoline which it purchased from Refining. There was no dispute between the parties regarding the declining value of the refinery, and Refining apparently did not hold Phillips responsible for such decline.

Nor was the settlement of the lawsuit directly related to the value of the refinery. Phillips viewed the settlement as a way of terminating the output contract which had proved to be extremely burdensome and expensive. Although Phillips' attorney believed that the company would prevail were the matter litigated, he also believed that if Phillips lost, the company's losses under the contract as reformed could continue indefinitely. He regarded the cancellation of the output contract as essential to any settlement. The settlement agreement canceled the 1966 output contract.

The petitioners bear the burden of proving that the debt cancellation constituted damages for the impairment of the value of capital. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933); *Hodge v. Commissioner, supra*; *Armstrong Knitting Mills v. Commissioner*, 19 B.T.A. 318 (1930). Refining may have viewed its claim against Phillips as arising from the decline in the value of the import quotas and of the refinery, and from the fact that the anticipated quota profits did not materialize, but its subjective belief regarding the nature of its claim is not determinative. *Agar v. Commissioner, supra*. Moreover, the evidence in the present case unequivocally indicates that Refining's claim did not directly concern the decline in value of the refinery but instead involved the price to be paid pursuant to the output contract. Had Refining prevailed in its action against Phillips, the latter would have been compelled to pay higher prices for Refining's products.

The character of the settlement "payment" is determined by Phillips' purpose in paying it. *Agar v. Commissioner, supra.* On this record, it is clear that Phillips wanted out of the output contract and that it canceled the debt in order to be released from such contract. It is as if Phillips paid Refining $2.6 million to be released from its obligations under the contract. Instead of increasing its payments to Refining to enable the latter to discharge its debts, Phillips simply canceled the debts. In view of these circumstances, we conclude that the debt was canceled as a means of paying for the settlement of any claims under the output contract and hence the payment must be treated as a payment for Refining's lost earnings. See *Commercial Electrical Supply Co. v. Commissioner, supra.*[8] It therefore represents ordinary income to Refining. The Commissioner's determination with respect to this issue is sustained.

The second issue for decision is whether the alkylation unit built by Refining during 1969 is eligible for the investment tax credit under section 49. Section 49(a) provided that property was not eligible for the investment tax credit if its physical construction, reconstruction, or erection was begun after April 18, 1969, or if the property was acquired by the taxpayer after such date, but such rules do not apply to "pre-termination" property. Section 49(b) described four classes of pre-termination property—four situations in which property was acquired or constructed after the termination date, but where Congress determined that it would be inequitable to deny the credit because of the economic commitment made by the taxpayer prior to the termination date. See *Erving Paper Mills Corp. v. Commissioner,* 72 T.C. 319, 322–323 (1979); H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 312; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 566. Section 49(b)(3), the plant facility exception, involved the situation where all the component parts of a plant facility would have qualified for the investment tax credit except that some of them were not constructed or acquired prior to the termination date. H. Rept. 91–413 (Part 1), *supra,* 1969–3 C.B. at 316–317.

Section 49(b)(3) provided that if pursuant to a plan in existence on April 18, 1969, the taxpayer constructed a plant facility, and if either the construction was commenced before

---

[8]See also *Biocraft Laboratories v. Commissioner,* T.C. Memo. 1980–268; *Lieb v. Commissioner,* T.C. Memo. 1974–272, affd. in an unpublished opinion 535 F.2d 1246 (3d Cir. 1976).

April 19, 1969, or more than 50 percent of the basis of depreciable property comprising the plant facility was attributable to property acquired or constructed by the taxpayer prior to April 19, 1969, then all property comprising the plant facility was eligible for the investment tax credit. Sec. 49(b)(3)(A). A "plant facility" was defined as a facility which did not include a building and which was a self-contained, single operating unit or processing operation located on a single site and identified, on April 18, 1969, in the financial plans of the taxpayer as a single unitary project. The petitioners argue that the alkylation unit is pre-termination property under the plant facility rule of section 49(b)(3).

The petitioners do not contend that the construction of the alkylation unit was commenced before April 19, 1969 (sec. 49(b)(3)(A)(ii)), and such a contention would prove unavailing. Prior to April 19, 1969, Refining staked out the project site and had test borings taken, but no other work was done. It is clear from the committee reports that Congress did not consider such preliminary work as clearing the jobsite and taking test borings to constitute commencement of construction for purposes of section 49(b)(3). See H. Rept. 91–413 (Part 1), *supra*, 1969–3 C.B. at 317; S. Rept. 91–552, *supra*, 1969–3 C.B. at 572.

The petitioners argue that the entire Okmulgee refinery, including the alkylation unit, constituted a plant facility, that on April 18, 1969, Refining had a plan to erect a portion of the facility (the alkylation unit), and that more than 50 percent of the adjusted basis of the total depreciable property constituting such facility was acquired during 1966, well before April 1969. See sec. 49(b)(3)(A)(iii). The Commissioner argues that the refinery and the alkylation unit together cannot be considered a plant facility, that the alkylation unit alone constitutes a plant facility, and thus that Refining did not acquire or construct the necessary portion of the property prior to the termination date.

We agree with the Commissioner that the entire refinery, including the alkylation unit, cannot be considered a plant facility. Congress itself rejected such interpretation:

Furthermore, the fact that a single operating unit or processing operation is connected, by pipes, conveyor belts, etc., to one or more other units or processing operations in an integrated processing or manufacturing system does not cause the whole system to be a plant facility. Examples of self-

contained, single-operating units or processing operations which may constitute a plant facility under this rule are a railroad switching yard, a railroad bypass route, a pipeline route or right-of-way, and an ethanolamines unit. [S. Rept. 91–552, *supra*, 1969–3 C.B. at 572; see similar language in H. Rept. 91–413 (Part 1), *supra*, 1969–3 C.B. at 317.]

The alkylation unit operated upon specific feed stocks to produce a high octane blending component; it was therefore a single processing unit, analogous in operation to an ethanolamines unit. The alkylation unit was located on land distinct and separate from the rest of the refinery. The alkylation process was independent of and not essential to the operation of the refinery, and in fact, the refinery could be, and for many years had been, operated without the alkylation unit. The refinery constituted "an integrated processing or manufacturing system" consisting of many operations and processes. We conclude that the "plant facility" for purposes of section 49(b)(3) was the alkylation unit. Since 50 percent of the depreciable property making up the alkylation unit had not been constructed or acquired prior to the termination date, such unit was not pre-termination property and thus was not eligible for the investment tax credit by reason of section 49(a). Accordingly, we sustain the Commissioner's determination with respect to this issue. To reflect concessions by the parties,

*Decisions will be entered under Rule 155.*

