T.C. Memo. 1997-356


UNITED STATES TAX COURT


MICHAEL CORRERA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18240-95.                    Filed August 4, 1997.


Michael Correra, pro se.

<u>Melanie M. Garger</u>, for respondent.


MEMORANDUM OPINION


RAUM, <u>Judge</u>:  The Commissioner determined deficiencies of

$10,749 and $840 in petitioner's 1991 and 1992 Federal income

taxes, respectively.  The parties have stipulated to a number of

issues, all in accordance with the notice of deficiency.  The

remaining issues are:  (1) Whether petitioner realized a capital

gain upon disposition of certain property as a result of its seizure by the Federal Deposit Insurance Corporation (FDIC); (2) whether petitioner is entitled to a deduction for real estate taxes paid by the FDIC on that property; and (3) whether petitioner is subject to the Alternative Minimum Tax for 1991. The year 1992 is involved only by reason of a $3,000 capital loss carryover from 1991. The case was submitted on the basis of a stipulation of facts.

Petitioner, Michael Correra, resided in Boston, Mass., when the petition in this case was filed. On May 5, 1987, he purchased commercial real estate located at 25 Exeter Street in Boston. The purchase price was $3,000,000, and the sellers were Robert Banker (Banker) and Alan E. Lewis (Lewis), as Trustees of Commex Realty Trust.

In order to acquire the property, petitioner incurred indebtedness as follows: (1) He executed a $2,000,000 Commercial Real Estate Promissory Note to Capitol Bank and Trust Company (Capitol Bank) secured by a first mortgage; and (2) he executed a $1,000,000 commercial promissory note to Banker and Lewis secured by a second mortgage. On the same day, May 5, 1987, Banker and Lewis assigned their note and second mortgage to Capitol Bank.

By Agreement dated March 5, 1990, petitioner refinanced his loan from Capitol Bank. Petitioner was then in default (apparently with respect to interest) on the $2,000,000 note.

Pursuant to the March 5, 1990 agreement, petitioner increased his indebtedness on the $2,000,000 note by borrowing an additional $600,000 from Capitol Bank. The $600,000 was stated to be for specified purposes in specified amounts, particularly, to pay interest owed on the $2,000,000 note, reduce the personal indebtedness of Banker and Lewis to Capitol Bank (for which he was apparently responsible), and pay outstanding real estate taxes on the Exeter Street property. In connection with this refinancing, petitioner executed a quitclaim deed on March 5, 1990, to an escrow agent.

Capitol Bank was seized by the FDIC sometime prior to April 11, 1991. On April 11, 1991, due to petitioner's default on the Capitol Bank notes, the FDIC took possession of the quitclaim deed from the escrow agent. On November 12, 1991, the FDIC executed a Mortgage Discharge in connection with the Exeter Street property which was recorded on December 17, 1991. At the time the FDIC took the quitclaim deed from the escrow agent, petitioner owed Capitol Bank a total of $3,600,000 in connection with the property. These debts were forgiven by the FDIC's Mortgage Discharge.

During 1991, petitioner had a $3,152,867 basis in the Exeter Street property. The parties have stipulated that if the Court determines that petitioner did not sustain a capital loss in

1991, petitioner is not entitled to a capital loss carryover of $3,000 in 1992.

Petitioner filed a petition with the Bankruptcy Court on December 12, 1991, seeking protection under Chapter 7 of the Bankruptcy Code. Petitioner was discharged from bankruptcy by order entitled Discharge of Debtor dated March 26, 1992.

The total real estate taxes due on the Exeter Street property during 1991 were $49,602.93. Petitioner agrees that they were paid in 1991 by the FDIC, and an exhibit before us discloses that they were paid on July 10, 1991, and August 15, 1991. Petitioner claimed in his 1991 Federal Income Tax return a deduction in the amount of $24,801 for real estate taxes paid by the FDIC. Respondent contends that petitioner is not entitled to any real estate tax deduction because he was not the payor of the real estate taxes.

1. Disposition of Exeter Street Property

Section 1001(a)[1] provides that "The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis". Section 1.1001-2(a)(1), Income Tax Regs., includes in the amount realized "the amount of liabilities from which the transferor is discharged as

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

a result of the sale or disposition."  And it follows from

Helvering v. Hammel, 311 U.S. 504, 506-511 (1941), that a seizure

or any other involuntary transfer qualifies as a "disposition" of

the property.

On April 11, 1991, as a result of petitioner's default on

the mortgage notes, the FDIC took possession of the quitclaim

deed executed by petitioner.  On November 12, 1991, the FDIC

executed a Mortgage Discharge in connection with the property.

Petitioner owed Capitol Bank $3,600,000 at that time.  The entire

amount was forgiven by the Mortgage Discharge.

This Court has held that when a taxpayer surrenders property

in exchange for cancellation of a debt, the transaction may be

characterized, in whole or part,[2] as a sale or exchange of

property rather than a cancellation of indebtedness.  Danenberg

v. Commissioner, 73 T.C. 370, 380-381 (1979).  The Court relied

upon R. O'Dell & Sons Co., Inc. v. Commissioner, 8 T.C. 1165,

1167 (1947), affd. 169 F.2d 247 (3d Cir. 1948), where the problem

was analyzed as follows:

> If an owner sells property for more than its basis, the
> assumption that there has been a taxable gain follows almost
> inevitably.  This is as true where the consideration
> received is property as where it is cash.  Sometimes, the
> transaction involves an atypical sort of consideration such

---

[2]  No issue is presented here involving the problem dealt
with in Gehl v. Commissioner, 102 T.C. 784, 786-787 (1994), affd.
without published opinion 50 F.3d 12 (8th Cir. 1995) where the
recourse indebtedness canceled exceeded the value of the property
surrendered.

as release of the transferor's indebtedness. That does not prevent the transfer from being a sale or exchange resulting in capital gain or loss. So where an owner pledges its property for a loan, the proceeds of which are greater than its basis, and subsequently succeeds in transferring the property for a cancellation of debt, the excess of what it received over the basis of the property is gain, taxable in the year in which the property is disposed of and the debt discharged. [Citations omitted.]

The FDIC seized the quitclaim deed petitioner had executed. In effect, petitioner received in exchange the Mortgage Discharge forgiving the entire $3,600,000 debt. And, as we noted above, the seizure, like any other involuntary transfer, qualifies as a "disposition" of the property, plainly within section 1001(a). See Helvering v. Hammel, supra. Since petitioner had a basis of $3,152,867 in the property, and since the amount discharged was greater by $447,133 than petitioner's basis, petitioner realized a capital gain of $447,133.

Among other contentions, petitioner has taken the position that the filing of his bankruptcy petition on December 12, 1991, 5 days before the FDIC's Mortgage Discharge of November 12, 1991, was recorded prevented that discharge from being effective under Massachusetts law. To be sure, Massachusetts law does provide that the "recordation of a duly executed and acknowledged deed of release or written acknowledgment of payment or satisfaction * * * shall be conclusive evidence that the mortgage has been discharged" notwithstanding prior assignment of the note unless there had been prior recordation of such assignment. Mass. Ann.

Laws ch. 183, sec. 54 (Law Co-op. 1991). The difficulty with petitioner's position is that there was nevertheless a valid cancellation of petitioner's debt by the FDIC on November 12, 1991, which was plainly binding between the parties and on anyone having notice even prior to recordation. No Massachusetts authority to the contrary has been called to our attention. We hold that petitioner has shown no error in the Commissioner's determination as to the gain realized on the property.

Petitioner contends, however, that section 108 requires exclusion of the gain from gross income. Section 108(a)(1)(B) provides that "Gross income does not include any amount which * * * would be includible in gross income by reason of the discharge (in whole or part) of indebtedness of the taxpayer if * * * the discharge occurs when the taxpayer is insolvent". The argument may be superficially appealing until critically examined. Apart from petitioner's failure to establish insolvency, as shown hereinafter, the point is fundamentally defective.

The $447,133 capital gain realized by petitioner upon cancellation of his $3,600,000 mortgage obligations was not discharge of indebtedness income. Section 108(a) applies only where there is cancellation of indebtedness income. See Estate of Delman v. Commissioner, 73 T.C. 15, 32 (1979), where the debt

cancellation issue was considered in the light of the insolvency exception. The Court there stated:

> A major exception to this general rule of income recognition upon debt cancellation is the insolvency exception which petitioners seek to invoke. * * * The insolvency exception applies only for cancellation of indebtedness income. For all other types of income, such as * * * gains from dealings in property, the solvency of the taxpayer is irrelevant. [Id.,citations omitted and emphasis added.]

In this case, the discharge of the indebtedness was effectively given in exchange for the Exeter Street property. As a result, as we indicated above, the transaction is treated as a sale, and the gain is treated as capital gain, rather than discharge of indebtedness income. OKC Corp. v. Commissioner, 82 T.C. 638, 648 (1984). There is no discharge of indebtedness income to be excluded from gross income.

In any event, petitioner has failed to establish his insolvency as required by section 108(a)(1)(B). Indeed the record appears to establish otherwise. His bankruptcy petition, filed December 12, 1991, after the Mortgage Discharge, indicates that his assets were $3,434,500 in the aggregate, an amount far in excess of his stated liabilities of $477,000. Section 108(a)(1)(B) accordingly is inapplicable here. Petitioner argues, however, that among his non-exempt assets of $3,434,500 listed in his bankruptcy petition were claims against others that were worthless and that in the aggregate accounted for the bulk

of the foregoing $3,434,500 assets.  Accordingly, his argument continues, if such claims are eliminated he should be treated as insolvent, and he thus qualifies for the insolvency exception of section 108.  However, even if section 108 were otherwise applicable, contrary to our conclusion above, the difficulty with that position is that he has presented no evidence as to the worthlessness of those claims.  And, in the absence of any clarifying evidence, the mere fact that the trustee in bankruptcy may not have pursued those claims or may not have realized on any of them for whatever reason is hardly sufficient to conclude that petitioner has carried his burden of proof.  The fact that this case was submitted to us on a stipulation of facts does not relieve petitioner of his burden of proof.  Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).

We hold that on this record there is no valid basis for changing our conclusion that section 108(a)(1)(B) is inapplicable here.  In the circumstances, we do not even reach the question posed by section 108(a)(3)[3] which in effect limits the amount excludable to the amount necessary to bring the taxpayer up to

---

[3]  Section 108(a)(3) states:

(3) Insolvency exclusion limited to amount Of insolvency.--
In the case of a discharge to which paragraph (1)(B)
applies, the amount excluded under paragraph (1)(B) shall
not exceed the amount by which the taxpayer is insolvent.

the level of solvency--a matter with respect to which petitioner has not presented any evidence whatsoever.

## 2.  Real Estate Tax Deduction

Section 164(a)(1) allows as a deduction "State and local, and foreign, real property taxes."  And section 1.164-1(a)(5), Income Tax Regs., provides generally that "taxes are deductible only by the person upon whom they are imposed."  On his return, petitioner claimed a deduction of $24,801 for taxes on the property, which the Commissioner disallowed.  The amount thus claimed and disallowed was one-half (rounded) of the $49,602.93 taxes paid, not by petitioner, but by the FDIC on July 10, 1991, and August 15, 1991, after it had become the owner of the property upon seizure of the quitclaim deed.

The Government argues that "petitioner no longer owned the property, and he is thus not entitled to a deduction for the taxes paid by the FDIC".  The Government's position would be correct, Mogg v. Commissioner, 15 T.C. 133 (1950), but for the provisions of subsequently enacted section 164(d).

Section 164(d) became law upon enactment of the 1954 Code. Petitioner relies upon section 164(d).  Applicable portions of section 164(d) are set forth in the margin.[4]

---

[4] Sec. 164(d)

(d) Apportionment of Taxes on Real Property Between Seller and Purchaser.--

(continued...)

Although section 164(d)(4) is captioned in terms of "seller and purchaser", we think it applies here. As we have held above, the involuntary taking of the property by the FDIC is treated broadly as a "disposition", a term that fairly includes "sale". And the parties to the involuntary transaction thus qualify as "seller and purchaser" within the meaning of the statute. There is no dispute between the parties here that the real property tax year here is the year July 1, 1990 to June 30, 1991, and that the FDIC's payment of taxes related to that tax year. Accordingly, pursuant to section 164(d)(1)(A), that portion of the $49,602.93 real estate taxes paid by the FDIC, which is allocable to the period July 1, 1990 to April 10, 1991, the day before seizure of the property by the FDIC, is "imposed on the seller [petitioner]." On brief, petitioner states that the amount thus allocable to and deductible by him is $38,381. Our own computation gives us a slightly higher figure. However, apart

---

[4](...continued)
> (1) General rule.--For purposes of subsection (a), if real property is sold during any real property tax year, then--
>
> (A) so much of the real property tax as is properly allocable to that part of such year which ends on the day before the date of the sale shall be treated as a tax imposed on the seller, and
>
> (B) so much of such tax as is properly allocable to that part of such year which begins on the date of the sale shall be treated as a tax imposed on the purchaser.

from petitioner's brief, the only amount that he ever claimed and put in issue is the $24,801 disallowed by the Commissioner in the deficiency notice.  The deduction that we approve is accordingly limited to that $24,801, and to this extent we rule against the Government.

3.  Alternative Minimum Tax

Section 55 imposes "a tax equal to the excess (if any) of * * * the tentative minimum tax for the taxable year, over * * * the regular tax for the taxable year."  The Commissioner determined that petitioner's tentative minimum tax exceeded his regular tax.  Petitioner did not specifically challenge the applicability of the alternative minimum tax in his petition, nor did he raise the issue or deal with it on brief.  He must therefore, be treated as having abandoned or conceded the issue.

Decision will be entered under Rule 155.